579 F.2d 973
 24 UCC Rep.Serv. 345
 The MANN AND PARKER LUMBER COMPANY, Plaintiff-Appellee-Cross-Appellant,
v.
WEL-DRI and Moore Dry Kiln Company of Oregon,
Defendants-Appellants-Cross-Appellees.
 Nos. 76-2557, 76-2558.
 United States Court of Appeals,
Sixth Circuit.
 Argued April 7, 1977.
Decided June 20, 1978.
 
 B. Percy Magness, Jr., Boone, Wellford, Clark, Langschmidt & Pemberton, Donald R. Wellford, Memphis, Tenn., for defendants-appellants-cross-appellees.
 James M. Manire, M. Anderson Cobb, Jr., Manire, Harris, Shelton & Dunlap, Memphis, Tenn., for plaintiff-appellee-cross-appellant.
 Before WEICK, CELEBREZZE and KEITH, Circuit Judges.
 WEICK, Circuit Judge.
 
 
 1
 This was an action for damages brought by plaintiff, The Mann and Parker Lumber Company, in the District Court against defendants, Wel-Dri, Inc. and Moore Dry Kiln Company of Oregon, for breach of a contract in which defendants agreed to sell and install at plaintiff's plant dry kilns and lumber handling equipment. Jurisdiction is based on diversity of citizenship. The case is governed by Tennessee law.
 
 
 2
 The District Court sitting without a jury found that there was a valid and enforceable contract and that the defendants breached it causing damage to the plaintiff in the amount of $95,410, plus interest at six percent from February 14, 1975. Both sides appeal.
 
 
 3
 We affirm the judgment of the District Court in its determination of liability, but reverse on the issue of damages, and we remand for recomputation of damages consistent with our opinion.
 
 
 4
 * Plaintiff, The Mann and Park Lumber Company, is a Maryland corporation, engaged in the wholesale distribution of lumber. It operated facilities located in Baltimore and Cockeysville, Maryland. During 1968 plaintiff decided to expand, and to consolidate its operations, by constructing a new facility at New Freedom, Pennsylvania. Upon completion of the New Freedom plant the Baltimore and Cockeysville operations were to be closed. In accordance with this plan Robert Bushman, plaintiff's president, solicited bids on lumber handling and drying equipment from various manufacturers of such equipment, for the New Freedom facility.
 
 
 5
 Among the companies contacted were Wel-Dri, Inc. (Wel-Dri), a Michigan corporation with its principal place of business in Memphis, Tennessee, and Moore Dry Kiln Company of Oregon (Moore Oregon), an Oregon corporation with a sales office serving the eastern portion of the United States in Carmel, Indiana. Plaintiff, however, initially signed a letter of intent to purchase the equipment from a third manufacturer, but subsequently withdrew from this commitment.[1]
 
 
 6
 On May 12, 1971 Walter Black, representing defendant, submitted to plaintiff two proposals for contracts. Proposal No. 306A dealt with the sale of two Moore Oregon "super kilns"[2] and two lumber handling systems, for an unspecified price. The second proposal, Proposal No. 311, called for defendant to provide labor and materials for installation of the equipment described in Proposal No. 306A.
 
 
 7
 Negotiations ensued, and the parties, on May 25th, reached an agreement on Proposal No. 306A which entailed certain modifications of its original terms. The parties executed a performance guarantee for the super kilns, which guarantee was incorporated into Proposal No. 306A, and provided in pertinent part as follows:
 
 
 8
 MOORE OREGON guarantees that the SUPER KILNS purchased by THE MANN AND PARKER LUMBER COMPANY will reduce the drying schedules for their lumber by an average of 50% Based on an average run of lumber species. The species to be evaluated together with their moisture content will be defined by Mr. Robert Bushman and reviewed by Walter K. Black or a qualified associate.
 
 
 9
 If the SUPER KILNS do not perform as specified above, MOORE OREGON will provide adequate production capacity to four (4) conventional dry kilns at no additional cost to THE MANN AND PARKER LUMBER COMPANY.
 
 
 10
 The reason for including the performance guarantee in the contract, as found by the District Court, related to the status of the super kiln as a new product. Because the super kiln, as of the date of the execution of Proposal No. 306A, had not been used in the lumber industry in the eastern portion of the United States, plaintiff wanted the assurance of a performance guarantee. Defendant was desirous of expanding the market for its super kiln, and therefore was willing to give such a guarantee.
 
 
 11
 Although the agreement reached on Proposal No. 306A included the costs of the equipment and its installation, the parties had not determined the terms and conditions of the installation work; that part of the contract remained open until August 25th when the parties reached an agreement with respect to this matter and executed Proposal No. 311.
 
 
 12
 Proposal No. 306A provided for a total price of $195,424, for the super kilns, the lumber handling equipment and their installation. The agreement further provided for installment payments by plaintiff, commencing with a down payment of fifteen percent of the total price, or $29,313.60. Plaintiff subsequently sent to defendant a check for $24,000. This payment was accepted by defendant, and in June, 1971 defendant began shipping to plaintiff parts and equipment for the super kilns.
 
 
 13
 In July or August, 1971 plaintiff, as agreed by the parties to the contract, submitted to defendant a history of its drying schedules, using conventional dry kilns, and covering the various species of lumber dried by it over a six year period at the Cockeysville facility, and the thickness and initial moisture content of that lumber. It was against this schedule that the performance of the super kilns was to be measured for purposes of determining whether the super kilns complied with the performance guarantee.
 
 
 14
 In October, 1971, as found by the District Court, defendant "deliberately repudiated the contract by advising the plaintiff that the defendant could not live with the performance guarantee as written and did not intend to go forward on the basis of the signed proposals to supply equipment and installation under any such guarantee." The parties subsequently attempted to negotiate a new agreement, without success. On February 14, 1972 defendant terminated negotiations with plaintiff.
 
 
 15
 On June 15, 1972 plaintiff contracted with Lawson Enterprises (Lawson) for the purchase of both lumber handling equipment and conventional dry kilns manufactured by Hildebrand, a German manufacturer represented by Lawson. Lawson, however, went bankrupt prior to performance of its obligation under the contract. In October, 1972 plaintiff contracted directly with Hildebrand for the purchase of four conventional dry kilns for a total price of $142,325.17, including installation. The combined holding capacity of the four Hildebrand kilns was approximately 152,000 board feet, in comparison with a combined holding capacity of approximately 50,000 board feet for the two super kilns.
 
 II
 
 16
 As of the date of the District Court's findings of fact and conclusions of law, plaintiff had purchased from other sources a stacker-unstacker. No other lumber handling equipment comparable to that provided for in the contract with defendant had been purchased.
 
 
 17
 Plaintiff commenced this action on November 5, 1973. Throughout the course of proceedings in the trial court plaintiff made numerous modifications of its claim for damages with respect to the type of injury for which it could recover, the amounts recoverable for each type of injury, and its theory of damages. The District Court summarized plaintiff's claim as follows:
 
 
 18
 ITEM A. Increase in cost of procurement of kiln dried lumber $128,247.89.
 
 
 19
 ITEM B. Increase in cost of procurement of dry kilns from another supplier $59,574.17.
 
 
 20
 ITEM E. Increase in cost of procurement of two lumber handling systems from a new supplier $10,991.82.
 
 
 21
 ITEM F. Increase in cost of labor involved in inspecting and handling lumber $99,625.20.
 
 
 22
 ITEM H. Additional engineering cost due to inaccurate specifications on building size $1797.00
 
 
 23
 ITEM L. Refund of contract deposit and interest at 6% $28,943.31 (Footnote omitted.)
 
 
 24
 After finding that the parties had entered into a valid and enforceable contract consisting of Proposals Nos. 306A and 311, the District Court dealt with plaintiff's claims for damages. With respect to Items A, F and H, the Court stated:
 
 
 25
 This Court recognizes the validity of the defense of the speculative, inaccurate, and improper elements of some of the proof with regard to some of those items. However, the Court need not painfully delineate those inadequacies because the Court agrees that consequential damages are excluded by provision 7 of the contract, which expressly states that the defendant will not be liable for ". . . consequential damages of any kind sustained by the buyer from any cause."
 
 
 26
 The District Court also found that plaintiff was entitled to $95,410, in liquidated damages, for defendant's failure to deliver and install the super kilns. The Court did not award damages for defendant's failure to deliver and install the lumber handling equipment, stating its reasons as follows:
 
 
 27
 The plaintiff has still not acquired an inspection and grading system, although there was testimony of Bushman that he had obtained a single proposal for such equipment from Irvington-Moore at a price of $47,550.00, no bids were obtained for the installation by the plaintiff. Therefore, this Court cannot assess damages for this. Furthermore, this equipment was part of a package contract. Inasmuch as the parties provided for liquidated damages in the form of pay for four conventional kilns, it appears that those damages should be the total damages for the breach of the contract.
 
 
 28
 Furthermore, the trial court held that Moore Oregon could retain plaintiff's down payment of $24,000, and that plaintiff could keep or sell the equipment shipped to it by defendant on the contract, prior to the breach.[3]
 
 
 29
 The total award of damages amounted to $95,410, to which the District Court added interest from February 14, 1972, the date when negotiations between the parties ceased. Both parties filed with the trial court motions for modification of findings of fact and conclusions of law. The motions were denied.
 
 III
 
 30
 Defendant raises three issues on appeal, as follows: (1) Whether the documents executed by the parties constitute a binding and enforceable contract; (2) Whether the District Court properly construed the performance guarantee as providing for liquidated damages in the case of a total breach of the contract by defendant; and (3) Whether the trial court erred in awarding plaintiff prejudgment interest.
 
 
 31
 In its cross-appeal plaintiff raises the additional issue of whether the District Court erred in holding that the contract precludes an award of consequential damages resulting from a breach of the contract by defendant.
 
 
 32
 Defendant contends that the contract is not sufficiently definite for enforcement because an essential element of the contract, namely, the performance guarantee, is too indefinite to be susceptible of meaning or application. In addition, it argues that the parties intended that there be no contract until an agreement was reached with respect to the drying schedule to be used as the measure of the super kilns' performance under the performance guarantee. Because the parties had never agreed upon such a schedule, defendant maintains that no enforceable contract came into existence.
 
 
 33
 We find these contentions to be without merit. The performance guarantee, in our opinion, is definite and certain. It provides that the super kilns would reduce plaintiff's drying times on an average by fifty percent. An explicit remedy was articulated by the parties in the event that the super kilns failed to meet the performance standard, I. e., defendant was to increase plaintiff's drying capacity, at no cost to the plaintiff, to the equivalent of four conventional kilns. A method was provided in the contract for measuring the super kilns' performance, that is, a schedule of drying times achieved by plaintiff in its conventional kilns was to be drawn up by Bushman and reviewed by Black or a qualified associate of Black. This provision is no more indefinite, in our opinion, than a provision for the determination of the price of goods on the basis of the market price on the date of delivery.
 
 
 34
 The mere fact that the parties did not include the drying schedule in the contract at the time of its execution does not mean that they intended that there be an agreement on the drying schedule as a condition precedent to the formation of a contract. To the contrary, there was no reason for the inclusion of the drying schedule in the contract at the date of the execution of the performance guarantee. As we understand the performance guarantee, the determination of the drying schedule was merely a mechanical act consisting of a compilation of the drying times achieved by plaintiff with its conventional kilns.
 
 
 35
 The contract was sufficiently clear to the parties that defendant accepted plaintiff's down payment, and it began shipping to plaintiff parts and equipment needed for the erection of the super kilns. Such actions are not taken by a party who believes that an essential element of a contract has been reserved for future agreement.
 
 
 36
 In our opinion the findings of fact adopted by the District Court on the issue of liability are supported by substantial evidence and are not clearly erroneous. Its conclusions of law are correct.
 
 IV
 
 37
 In determining the damages suffered by plaintiff because of defendant's failure to deliver and install the super kilns, the District Court construed the performance guarantee as providing for liquidated damages in the event of a total breach of the contract by defendant. The Court reasoned as follows:
 
 
 38
 This court has found that the defendant deliberately breached the contract because it could not comply with this guarantee. Therefore, this Court concludes that the defendant should pay the plaintiff the installed value of "adequate production to four conventional dry kilns at no additional cost to" the plaintiff. The guarantee contemplated completion of the contract; however, this Court does not believe that the fact that there was only partial completion of the contract defeats the obligation. This Court does believe that the application of this guarantee entitles the defendant to keep the deposit which is the basis for plaintiff's claim set forth in Item L. By the same token, the plaintiff may keep or sell for its own account the equipment which defendant had delivered and which forms the basis of a set off against the tendered net deposit.
 
 
 39
 As reflected earlier herein the plaintiff ultimately acquired four conventional Hildebrand kilns instead of the two super kilns contracted for with the defendant. The total cost of the Hildebrand kilns installed was $142,345.17. However, the four Hildebrand kilns have a greater drying capacity than the Moore super kilns.
 
 
 40
 Rated holding capacity of dry kilns is expressed in terms of how much lumber the kiln will hold. The Moore kilns were designed with a maximum holding capacity of approximately 25,000 board feet of 4/4 lumber or a total of approximately 50,000 board feet total for the two kilns. The maximum holding capacity of each of the four Hildebrand kilns utilizing 4/4 lumber, is approximately 38,000 board feet, or a total holding capacity of 152,000 board feet for the four kilns. Drying capacity is a function of holding capacity and drying time. The Moore super kilns or high temperature kilns under the performance guarantee were represented to have the ability to reduce average drying times by 50% Over conventional kilns. Assuming the Moore kilns could dry lumber in half the time required to dry the same lumber in the Hildebrand conventional kilns, each of the Moore kilns would dry a 25,000 board foot charge (holding capacity) each five days, while each Hildebrand kiln could dry a 38,000 board foot charge (holding capacity) each ten days. Thus, in a ten-day period, the two Moore kilns would have a total drying capacity of 100,000 board feet, while during the same ten-day period the Hildebrand kilns would have a drying capacity of 152,000 board feet (Tr. Ex. 49). . . .
 
 
 41
 There is a direct relationship between the cost of dry kilns and their holding and drying capacities. The larger the capacity, the higher the price.
 
 
 42
 . . . The relative drying capacity of the Moore kilns to the Hildebrand kilns is approximately 65.8 percent. By applying that percentage to an approximate cost of $145,000.00, a value for comparable conventional kilns comes to $95,410.00.
 
 
 43
 Defendant contends that the District Court applied the wrong measure of damages. We agree.
 
 
 44
 The performance guarantee does not purport to furnish a remedy for a total breach of the contract; rather, it provides for liquidated damages only in the event that the super kilns failed to reduce by one-half the drying times achieved by plaintiff in its conventional kilns. Thus the liquidated damages provision of the performance guarantee would come into play only after the super kilns were put into operation and if it was established that they failed to perform as guaranteed by defendant. Because the contract was breached by defendant prior to the installation of the super kilns, the liquidated damages provision of the performance guarantee is inapposite to the facts of this case.
 
 
 45
 It is obvious that defendant, in breaching the contract, was not willing to guarantee that its so-called innovative super kilns would perform as guaranteed.
 
 
 46
 The District Court, in determining the damages suffered by plaintiff as a result of defendant's breach with respect to the super kilns, should have applied the buyer's remedies provisions of the Uniform Commercial Code. T.C.A. § 47-1-101, Et seq.
 
 
 47
 The award of damages is, therefore, vacated, and this issue is remanded for redetermination pursuant to T.C.A. §§ 47-2-712, 47-2-713. Regardless of whether the District Court on remand determines that the cover remedy provisions of § 47-2-712, or the contract-market measure of damages provisions of § 47-2-713 apply to the facts of this case, the Court should base the cost of cover or the market price of dry kilns on the installed cost of conventional dry kilns with a holding capacity twice that of the super kilns.
 
 
 48
 It is clear that the intention of the parties, when they executed the performance guarantee, was that the super kilns' productivity was to be the equivalent of conventional dry kilns with twice their holding capacity. Thus, upon a total breach it is, in our opinion, consonant with this intent to include in any calculation of plaintiff's damages the installed cost of conventional dry kilns with a holding capacity double that of the super kilns.
 
 V
 
 49
 Under T.C.A. § 47-2-711 plaintiff is entitled to recover its down payment. This statute, however, does not provide for the recovery by defendant of the value of the parts and equipment shipped by it to plaintiff prior to its breach. The UCC does not provide a remedy for this specific situation. In such a case other state principles of law and equity supplement the U.C.C. T.C.A. § 47-1-103; Admiral Plastics Corp. v. Trueblood, Inc., 436 F.2d 1335, 1338-39 (6th Cir. 1971); Moore v. Howard Pontiac-American, Inc., 492 S.W.2d 227, 230 (Tenn.App.1972). Under common law and equitable principles we believe that defendant is entitled to recover the parts and equipment remaining in plaintiff's possession, and the fair value of the parts and equipment which plaintiff has used for its own purposes or has otherwise disposed of. Cf. Restatement of Contracts § 357 (1932); 5A A. Corbin, Contracts §§ 1122, 1128 (1964); 2 Williston on Sales § 497 (2d ed. 1948).
 
 VI
 
 50
 The District Court denied plaintiff damages resulting from defendant's failure to deliver and install the lumber handling systems on the grounds that plaintiff had not purchased complete substitute systems, and that the performance guarantee provided for liquidated damages for a total breach of the contract in the form of conventional dry kilns with a drying capacity twice that of the super kilns. As discussed above, the District Court misconstrued the performance guarantee with respect to liquidated damages. Moreover, we know of no principle of contracts that requires an aggrieved buyer to purchase substitute goods with respect to each and every part of the contract in the event of a total breach of contract, as a condition precedent to an award of damages for that breach.
 
 
 51
 Consequently, we remand to the District Court the question of damages resulting from defendant's failure to deliver and install the lumber handling systems. To the extent that plaintiff can establish damages because of defendant's failure to deliver and install such equipment, the District Court should calculate the amount of damages pursuant to T.C.A. § 47-2-713.
 
 
 52
 We are of the opinion that plaintiff's claim for damages was unliquidated, and that the District Court erred in allowing prejudgment interest.
 
 
 53
 Careful consideration has been given to plaintiff's contention that the District Court erred in not granting to it consequential damages. We find plaintiff's assertions on this issue to be without merit.
 
 
 54
 The judgment of the District Court is affirmed in its determination of the issues of liability and is reversed only in its determination of damages. The case is remanded for redetermination of damages consistent with our opinion, and for the entering of judgment therefor.
 
 
 
 [1]
 During this interim period Moore Oregon acquired all the stock of Wel-Dri and began to operate it as a wholly owned subsidiary. In February, 1972 Wel-Dri was liquidated in kind and its assets were distributed to Moore Oregon. Although at trial Moore Oregon contended that the contract forming the basis of this lawsuit was solely the obligation of Wel-Dri, the District Court held that Moore Oregon was liable thereon, and the parties for purposes of this appeal have accepted this determination. Hereinafter we will not distinguish between the two corporations, and they will be referred to as "defendant."
 
 
 [2]
 The super kilns were supposed to be an innovation in lumber drying at the time defendant's proposals were sent to plaintiff. The kilns used higher drying temperatures, up to 230 to 240o , and air velocities greater than conventional kilns. According to Black, the advantage of a super kiln was that it could reduce substantially the drying time of lumber, without increasing degrade, that is, damage to the lumber upon drying. This shorter drying period gives the super kiln a productivity greater than conventional kilns of the same capacity, resulting in substantial long run savings in the cost of kiln drying lumber
 
 
 [3]
 Defendant, in its brief, states that the value of this equipment amounts to $8,138.16