FUQUA HOMES, INC., APPELLANT, *v.* EVANSTON BUILDING
AND LOAN COMPANY ET AL., APPELLEES.

(No. C-76691—Decided July 27, 1977.)

*Messrs. Kelley, Grossheim & Bavely,* for appellant.

*Messrs, Cohen, Todd, Kite & Spiegel, Mr. James Q. Doran* and *Mr. Terrence A. Mire,* for appellees Evanston Building and Loan Company, Kenneth Ryan and Wilma Ryan.

*Per Curiam.* This cause came on to be heard upon the appeal; the transcript of the docket, journal entries and

original papers from the Court of Common Pleas of Hamilton County; and the transcript of proceedings, the briefs and the arguments of counsel.

The trial court entered a judgment against Fuqua Homes of Ohio, Inc. (hereinafter called Fuqua), a manufacturer of "modular homes," and in favor of all defendants except two. Kirk and Underhill operated a partnership known as "MMM," which constituted the middleman-dealer in the reported sale and delivery of a modular home, and had disappeared after receiving the proceeds from the purchasers. They were not served in this action. The defendants in whose favor judgment was granted were Kenneth and Wilma R. Ryan, the purchasers of the modular home (hereinafter called the Ryans), and Evanston Building & Loan Co., lender to the Ryans (hereinafter called Evanston). Such was the activity of MMM that neither the Ryans nor Evanston knew of Fuqua's claim on the modular home until after it had been placed on Ryans' real estate, and Fuqua did not know who had purchased it or where it was located. The case presents the conflicting interests of two innocent parties after the thieves have fled, taking the money with them. The trial court held that the loss must fall on the manufacturer, and we agree.

The modular home manufactured by Fuqua and purchased by the Ryans consisted of two structures, each of which is 12 feet wide and 55 feet long; each is fitted with wheels and an A-frame trailer hitch and has a temporary covering on one side to be retained during transit. The two units are separately towed to the site, where the temporary covering is removed, and the two units placed side by side and so connected so as to form one weathertight unit.[1]

---

[1] The parties assumed that the modular home was a "house trailer" and thus a "motor vehicle" covered by the Certificate of Motor Vehicle Title Law, R. C. Chapter 4505. For purposes of this appeal we have proceeded as though that assumption were true. Although it would dispose of this appeal, we do not reach the question of whether or not a modular home is in law a "house trailer," for the following reason: R. C. 4503.06 imposes an annual tax on house trailers for the benefit of the general revenue fund of the local subdivision in which the house trailer has its situs, and we refrain from reaching a conclusion

The Ryan transaction was the seventh one in which MMM acted as middleman-dealer for Fuqua products. It began, as did the others, with the purchasers' selection of a certain model of modular home from the sales literature and the plans and specifications made available by Fuqua to MMM. The Ryans entered into an agreement to buy their selection from MMM who was obligated to furnish the structure and prepare the site, including foundation, on land earlier purchased by the Ryans. MMM telephoned the order to Fuqua who mailed a written confirmation back to the dealer and then proceeded to produce and later ship the two units.[2] Accompanying the shipment to MMM were copies of the invoice and Fuqua's "warranty documents" signed in blank but showing the model and serial number of the units. While the record does not reveal the exact content of these warranty documents, it discloses that they were delivered to the Ryans "at the closing," fully completed and signed.

Evanston financed the transaction for the Ryans, taking a mortgage on the real estate on which the structure was placed, and disbursed all funds, including those for the real estate agent (required by MMM), those for site work and other construction costs, and those due to MMM under the agreement. After receiving all but a modest sum reserved by Evanston to cover the cost of final grading and seeding, the MMM partners disappeared without

---

eliminating such annual tax on a modular home in a case where the taxing authorities are not represented. Nevertheless, we note that in 1970 Ohio Atty. Gen. Ops. 2-25, No. 70-013 and 1976 Ohio Atty. Gen. Ops. 2-76, No. 76-025, the Attorney General has stated his opinion that a modular home is not a "house trailer," because when it is used as a conveyance it is not usable for human habitation and when used for human habitation, it is not usable as a conveyance.

[2]Fuqua and MMM originally thought that MMM's purchase of the modular home would be financed by Dollar Federal Savings & Loan under the existing floor plan arrangement between manufacturer and dealer. However, for reasons not explained in the record, the financing agency withdrew before the transaction was closed, returning the original invoice and the manufacturer's certificate of origin to Fuqua. The financing agency was not a party in the case.

having remitted any payment to Fuqua, who still holds the manufacturer's certificate of origin.

Fuqua claims that, as the unpaid holder of the certificate of origin, it has title to the modular home under R. C. Chapter 4505, the Certificate of Motor Vehicle Title Act. We disagree. That law grants a unique status to a certificate of origin (or a certificate of title), but the rights it creates in a holder of such a certificate are not absolute. A holder does not prevail against all the world under any and all circumstances.[3]

Before passing on the five assignments of error, we note our conclusion that this case is controlled by *Commercial Credit Corp.* v. *Pottmeyer* (1964), 176 Ohio St. 1. As limited by *Hardware Mutual Casualty Co.* v. *Gall* (1968), 15 Ohio St. 2d 261, which overruled it in part, *Pottmeyer* stands for the following principle:

"When one of two innocent persons must suffer from the fraud of the third, the one who made it possible for the fraud to be perpetrated must bear the loss. While the majority of jurisdictions require the entrustment of a certificate of title or other indicia of ownership to a conditional sales vendee as well as the entrustment of the automobile, itself, Ohio has found mere possession of the automobile sufficient indicia of ownership in a conditional sale vendee. *Kelley Car Co.* v. *Finkler,* 155 Ohio St. 541." (*Hardware Mutual Casualty Co.* v. *Gall, supra,* at 267.)

---

[3]For instance, in *Hardware Mutual Casualty Co.* v. *Gall* (1968), 15 Ohio St. 2d 261, the Supreme Court held that the Certificate of Motor Vehicle Title Act does not abrogate the rule that the law of the state where a lien is created determines the creation and transfer of interest in the motor vehicle, and foreign certificates of title will be recognized in Ohio as evidence; the Ohio title law does not apply where the holder of such foreign title is not otherwise obligated to procure an Ohio title. *Shaw* v. *Wearley Motor Co.* (1962), 173 Ohio St. 185, holds that the title act does not nullify an express guarantee when the seller chooses to incorporate it in the terms of the transaction. *Mutual Finance Co.* v. *Kozoil* (1961), 172 Ohio St. 265, holds that R. C. Chapter 4505 cannot be used to defeat the title of a bona fide purchaser of the motor vehicle when the financing agency with a lien on the vehicle consented to its exposure for sale at a time when the financing agency had full knowledge of the dealer's long-time misuse and mishandling of funds.

The first assignment of error claims the court was wrong in applying the Uniform Commercial Code to the facts in this case "in preference to the Ohio Certificate of Title Law," and the second assignment claims error in holding that the modular home units were "goods" (R. C. 1302.01[A][8]) and not "motor vehicles" (R. C. 4501.01 [B] and [L]). Both assignments are without merit.

Our first reason for this conclusion is that the underlying transaction was a sale governed by R. C. Chapter 1302. We concur with the reasoning of the Eighth Appellate District Court in *Levin* v. *Nielsen* (1973), 37 Ohio App. 2d 29, to the effect that while the only admissible evidence of title is a certificate of title or origin, an admission in the pleadings, and a stipulation, the law "was not meant to, and does not, prevent a court of equity from ordering the title to be transferred *if the holder has bound himself to do so,* directly or through an agent." (Page 33.) The Ninth Appellate District approved the *Levin* holding in *Carnegie Financial Corp.* v. *Akron National Bank* (1976), 49 Ohio App. 2d 321. R. C. Chapter 4505 states how ownership and interest in motor vehicles are evidenced, recognized, recorded, and normally transferred, but it does not set forth the only provisions whereby title is acquired in the first instance to the exclusion of all other law. For instance, a seller may expressly guarantee against all previous liens and encumbrances and the provisions of R. C. 4505.04 will not nullify such a guarantee even though the liens are not shown on the certificate of title. *Shaw* v. *Wearley Motor Co.* (1962), 173 Ohio St. 185.

The acquisition of ownership of a motor vehicle is governed by R. C. Chapter 1302 of the Ohio Uniform Commercial Code, because motor vehicles and house trailers fall within the definition of "goods" in R. C. 1302.01(A) (8). They are things "which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities and things in action." The perfection of a security interest in a motor vehicle is governed by R. C. 4505.13, and not by R. C. Chapter 1309, but in this case Fuqua asserts not

a security interest in the vehicle but ownership thereof.

The sale from MMM to the Ryans is governed by R. C. 1302.44 (B), which reads in full as follows:

"Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in ordinary course of business."

MMM is a "merchant,"[4] and the Ryans qualify as "buyers in the ordinary course of business."[5] The transfer of the two units in a mobile state from MMM to the Ryans transferred all of Fuqua's rights, and the Ryans were thereupon entitled to have their ownership evidenced by a certificate of title.

Our second reason for concluding that the rights of the parties are not governed by the Certificate of Motor Vehicle Title Act is that from and after the moment the two units were joined as one habitation and attached permanently to the foundation, the resulting structure became part of the real estate. 1976 Ohio Atty. Gen. Ops. 2-76, No. 76-025. It could not be considered a motor vehicle under any provision of law; it had been converted into real estate.

The third assignment of error reads: "The court concluded that Kirk and Underhill were 'sales agent' of the

---

[4]R. C. 1302.01(A)(5) reads in full:

"'Merchant' means a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill.

[5]R. C. 1301.01(I) reads in full:

"(I) 'Buyer in ordinary course of business' means a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind but does not include a pawnbroker. 'Buying' may be for cash or by exchange of other property or on secured or unsecured credit and includes receiving goods or documents of title under a preexisting contract for sale but does not include a transfer in bulk or as security for or in total or partial satisfaction of a money debt."

appellant.". This assignment of error is well taken, but the error is harmless.

The trial court concluded that MMM's implied warranty of good title (R. C. 1302.25) bound Fuqua because MMM was "sales agent" for Fuqua. However, we are unable to conclude that under the facts and circumstances in this case, MMM can be said to be the agent of Fuqua. Their relationship with Fuqua is that of buyer and seller on credit. The Ryans did not contract to buy the modular home with Fuqua, but with MMM, and the agreement obligated MMM to perform services which were unique to this particular transaction and not guaranteed or warranted by Fuqua.

There is no agency by estoppel because that doctrine "rests upon the theory that one has been led to rely upon the appearance of agency to his detriment. * * * It is usually applied in those cases where credit has been extended, action has been induced, delay has been obtained, or some other change in position has occurred, in reliance upon the appearance of authority." *Johnson* v. *The Wagner Provision Co.* (1943), 141 Ohio St. 584, at 590.

However, since the court had an alternative reason for granting judgment against appellant, the inadequacy of the "agency" grounds does not constitute reversible error.

The fourth assignment—that the court erred in concluding that the Ryans and Evanston were innocent parties, without means to protect themselves from Fuqua's claim—is without merit, because this finding was legally correct. The purchasers have no obligation under the law to demand or search the certificate of origin. We concur with the reasoning of the Ninth Appellate District in *Carnegie Financial Corp.* v. *Akron National Bank, supra,* that the law creates no duty in the purchaser or its financing agency to hold back the purchase price until a clear title is received. To require the purchaser or financier to receive clear title before paying would stop the free flow of commerce and impede established commercial practices in motor vehicle transactions. The floor plan financier will not

release the lien (*i. e.*, the certificate of origin) until the middleman-dealer pays his promissory note and the middleman-dealer cannot pay the note until he receives funds from the purchaser or his financier. To establish the principle of law proposed by Fuqua would place the parties in a practical impasse.

The fifth assignment of error is that the court was wrong in concluding that Fuqua "negligently entrusted" the modular units to MMM, thus estopping itself from asserting its claim as a true owner. This assignment is also without merit, because the trial court did not find that Fuqua was negligent. On the contrary, the court concluded that both Fuqua and the Ryans were innocent parties but that Fuqua must sustain the loss because it placed MMM in a position to cause the loss. While the court used language of estoppel in parts of its "conclusions of law," this use, if error, was not prejudicial, because the final judgment had a sound base in R. C. 1302.44(B).

Finding no error prejudicial to plaintiff, we affirm.

*Judgment affirmed.*

BETTMAN, P.J., CASTLE and BLACK, JJ., concur.