The MEAD CORPORATION,
Plaintiff-Appellee,

v.

McNALLY–PITTSBURG MANUFAC-
TURING CORPORATION,
Defendant-Appellant.

No. 78–3320.

United States Court of Appeals,
Sixth Circuit.

Argued June 16, 1980.

Decided July 22, 1981.

Joseph A. Oths, Oths, Foley & Heiser, Wellston, Ohio, Charles F. Clarke, Cleveland, Ohio, for defendant-appellant.

Armistead W. Gilliam, Jr., Smith & Schnacke, Charles J. Faruki, Dayton, Ohio, for plaintiff-appellee.

Before ENGEL and BOYCE F. MARTIN, Jr., Circuit Judges, and CELEBREZZE, Senior Circuit Judge.

ENGEL, Circuit Judge.

Defendant McNally-Pittsburg Manufacturing Corporation appeals from a judgment rendered in favor of The Mead Corporation in an Ohio diversity suit for damages allegedly suffered from breach of contract.

McNally entered into a contract with Mead for the construction of a coal washing plant and related facilities to be used at a coal mine Mead had acquired in 1968. This plant, when operational, was to process coal in order to enhance its metallurgical quality. The process called for the coal then to be weighed and loaded into freight cars for shipment.

McNally failed to deliver a fully operational facility on the expected date of completion. Mead brought suit in district court, alleging a wide array of damages resulting from McNally's breach of the contract. During closing argument Mead asked for $2,617,220.22 in damages, itemized as follows:

| | | |
|---|---|---:|
| 1. | Losses Due to Closing of Mines | $199,000.00 |
| 2. | Premium Lost | 719,000.00 |
| 3. | Freight Charges | 417,296.31 |
| 4. | Loading Charges | 89,947.53 |
| 5. | Weighing Charges | 231,988.54 |
| 6. | Excess Magnetite Useage | 233,125.26 |
| 7. | Repair Costs | 2,748.41 |
| 8. | Corporate Engineering Charge | 12,881.00 |
| 9. | Cost of Replacement Scales | 147,392.50 |
| 10. | Cost of Capital Projects Resulting from McNally-Pittsburgh's Responsibility | 162,700.00 |
| 11. | Excess Field Labor Escalation Charge | 341,140.67 |
| 12. | Estimated Future Weighing Charges Until Replacement Scale is Installed, Estimated to be Five Periods | 60,000.00 |
| | TOTAL | $2,617,220.22 |

In its counterclaim McNally sought the unpaid balance of the contract price being withheld by Mead because of the breach, an amount which it claimed during closing argument came to $1,696,312. McNally also denied liability for certain contract damages sought by Mead.

The jury returned a verdict for Mead on its principal claim in the amount of $510,000, and a verdict for McNally on its counterclaim in the amount of $1,294,000. The verdicts were returned on forms devised, and agreed to, by both parties. No provision was made for special interrogatories or any other method for ascertaining how damages were awarded.

Defendant McNally has appealed the verdict awarding Mead damages, and seeks a remand of the case to the district court with directions to reduce the damages to a sum which, it maintains, constitutes the maximum amount legally recoverable under the contract. Specifically, McNally argues that, as a matter of law, it is entitled to relief from the jury verdict in the amount of $272,300. Thus, the narrow question upon this appeal is whether, as a matter of law and based upon the record before us, the amount of the judgment in excess of $237,700 can only represent damages for which McNally is not legally responsible. We affirm.

At the outset, we note the factual and legal complexity of this case as it was tried in the district court. The trial lasted two full weeks, and the record consists of over 1500 pages of trial transcript, 800 pages of exhibits, and numerous depositions and affidavits. From this mountain of documentation, two crucial issues emerge on appeal: (1) when was a contract formed between the parties and what provisions did the contract include, and (2) what damages were actually proved and may be recovered under that contract?

I.

## THE CONTRACT

The parties are agreed that the contract issue requires application of Ohio's version of the Uniform Commercial Code § 2–207, Ohio Rev.Code § 1302.10, popularly known as the "Battle of the Forms" provision.[1] *See* White & Summers, *Uniform Commercial Code* 23 (1972); *Dorton v. Collins & Aikman Corporation*, 453 F.2d 1161 (6th Cir. 1972). Section 1302.10 provides:

(A) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional or dif-

---

1. We can safely assume, without extensive legal analysis, that Ohio Rev.Code § 1302.10 provides the applicable rule of law in this case. We note that the contract was for the manufacture of a complex piece of machinery, and the Code applies to transactions involving goods. Ohio Rev.Code § 1302.02.

"Goods" are defined in Section 1302.01 as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale . . . ." Several judicial decisions would indicate that the manufactured item involved in this appeal falls within the concept of "goods." *See Mann & Parker Lumber Co. v. Wel-Dri*, 579 F.2d 973 (6th Cir. 1978) (Tennessee version of Uniform Commercial Code applied to a contract to install dry kilns and lumber handling equipment in lumber plant); *Fuqua Homes, Inc. v. Evanston Building and Loan Co.*, 52 Ohio App.2d 399, 370 N.E.2d 780 (1977) (court held the sale of modular home, consisting of separate units to be joined into single residential structure, constituted sale of goods under the Code); *Omaha Pollution Control Corp. v. Carver-Greenfield*

*Corp.*, 413 F.Supp. 1069 (D.Neb.1976) (Code applied to contract for construction of sewage treatment plant). In *Pittsburgh-Des Moines Steel Co. v. Brookhaven Manor Water Co.*, 532 F.2d 572, 580 (7th Cir. 1976), the court, in deciding whether the Code applied to the construction and sale of a one million gallon water tank, stated:

We find ample support in the cases arising under the UCC itself that the scope of coverage of "goods" is not to be given a narrow construction but instead should be viewed as being broad in scope as to carry out the underlying purpose of the Code in achieving uniformity in commercial transactions. The Code, which by its own terms, § 1–102, is to be liberally construed, should be uniformly applied to achieve its purposes.

It should be noted that both parties to this dispute presented their case to the jury as a contract dispute falling within the scope of the Uniform Commercial Code; both parties continue to argue their case on appeal assuming that the Code applies.

ferent from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

(B) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

(1) the offer expressly limits acceptance to the terms of the offer;

(2) they materially alter it; or

(3) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

(C) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of Chapters 1301., 1302., 1303., 1304., 1305., 1306., 1307., 1308., and 1309. of the Revised Code.

The trial judge submitted the case to the jury and quoted the above section without great elaboration, apparently convinced that it was for the jury to decide, upon disputed facts, the substance of the parties' agreement. While we agree that certain facts were disputed, those disputes did not affect the nature of the contract as finally embodied in the written language explicitly and knowledgeably employed by the parties. To understand this conclusion, it is necessary to examine in some detail the course of contract negotiations between the two parties.

Mead acquired a coal mine in Mulga, Alabama, when it purchased Woodward Iron Company in 1968. In order to produce a better quality coal, Mead decided to replace the existing coal washing facility with a new plant. Mead retained McNally and paid it $7,000 to prepare the technical bid specifications for the new facility. Mead incorporated these specifications into a bid package which it submitted to several manufacturers to obtain price quotations for the new facility. Mead instructed each bidder to note any exceptions to the general conditions and specifications in the bid package (hereinafter referred to as the "bid solicitation").[2] One such condition was a standard *force majeure* clause, excusing both seller and purchaser from any liability for damages arising from actions or events beyond their control.[3]

McNally and others responded to the bid solicitation by submitting their separate bid proposals. McNally's bid proposal, denominated "W–2394," appeared to be most attractive and was tentatively accepted by Mead. McNally had noted several exceptions to the Mead bid solicitation, although none involved the *force majeure* clause. Moreover, McNally's proposal included two additional exculpatory clauses: one disclaiming liability for damages, including

**2.** Section 7.1 of Mead's bid package reads as follows:

Exceptions: Bidder shall submit a clear and specific list of all exceptions taken to the drawings, specifications, general conditions, Parts I and II, and all other documents making up this Request for Quotation. Other than exceptions, if any, it shall be expressly implied that the Bidder accepts all other parts of the drawings, specifications, General Conditions, Parts I and II, and all other documents making up this Request for Quotation.

**3.** Mead's *force majeure* clause contained in its initial bid solicitation reads as follows:

31. *Force Majeure*

Neither party hereto (owner or contractor) shall be liable to the other party for any delay in performing or failure of performance un-

der this agreement due to riot, war, or hostilities between nations, court orders, governmental or governmental agency orders or regulations, acts of God, fire, accident, strikes, or differences with workmen, delays of carriers, lack of or failure to obtain sufficient electric power or (without limiting the foregoing) due to other contingencies of a similar or dissimilar nature beyond the reasonable control of such party, and the party affected by the happening of any such contingency shall give the other party reasonable notice thereof, in writing, and if additional time is required for the completion of the work because of the happening of such contingency, a proportion of extension of time for completion shall be allowed as shall be determined by the Engineer . . . .

consequential damages, arising from a delay in the delivery or completion of the coal washing plant,[4] and another establishing a liability ceiling on damages arising from the loss of magnetite, an essential ingredient used in the coal washing process.[5]

Negotiations then ensued during which representatives from Mead and McNally discussed these exceptions as well as other elements of the McNally proposal. The rec-

ord indicates that most of the exceptions were resolved; however, both parties disagreed on the question of liability for consequential damages from delay and damages arising from excess loss of magnetite. From our thorough reading of the record, the two parties left the negotiations without resolving this critical question.[6]

Mead then sent an order to McNally for the purchase of the coal washing plant, to

4. McNally's bid proposal included the following exculpatory clause, upon which the dispute in the district court turned:

14. DELIVERY AND COMPLETION: Contingent upon delays resulting from transportation delays, governmental regulations, strikes, suspensions, fires, accidents, riots, failure of suppliers or other causes beyond our control, we predict that shipment of all materials and equipment set forth by this proposal will be completed within fourteen (14) months and all work contemplated by this proposal will be completed within eighteen (18) months after acceptance of this proposal as a contract. It is expressly agreed that we shall not be responsible for any loss to you whether direct, indirect, consequential, special or otherwise which may arise out of or be in any way connected with any delay in the delivery or operation of this installation.

5. McNally's bid proposal also included the following limitation on liability for excess magnetite loss:

D. *Magnetite Consumption*

1. *Lo-Flo Bath and Cycloid Circuits*:

For each one-tenth (.10) pound loss of magnetically susceptible magnetite per ton of feed to the LoFlo bath and the cycloids over the calculated magnetite loss of 2 pounds per ton of feed, as guaranteed and specified in Page D.2, Paragraph D.3, we will accept a penalty as follows:

Penalty—.10 × $50,000.00

In any event, the maximum penalty assessable shall not exceed $50,000.00.

2. *Heavy Medium Cycloid Circuit:*

For each one-tenth (.10) pound loss of magnetically susceptible magnetite per ton of feed to the heavy medium cycloids over the calculated magnetite loss of 2½ pounds per ton of feed, we will accept a penalty as follows:

Penalty—.10 × $25,000.00

In any event, the maximum penalty assessable shall not exceed $25,000.00.

6. At trial, Carl Christian, Director of Purchasing for Mead, who was intimately involved in the negotiation process, testified as to his discussions with representatives from McNally regarding the consequential damage provision.

Question: Tell me exactly what you recall of that discussion. I want every detail you recall of that.
Answer: We discussed every item item-for-item as we went down the page together, and any objection that was raised we talked about and discussed. Mr. Milliken wanted to be relieved from consequential damages on this job, and this discussion got rather warm because there is no way that we could enter into this contract and allow consequential damages not to be recovered.
So I told Mr. Milliken that we would—I can remember he was sitting about two seats over on my right, and I told him the terms and conditions in our bid package, General Conditions, Parts I and II, or the terms and conditions on our purchase order form would have to prevail and would be our contract.
Question: What did Mr. Milliken say about that?
Answer: Well, he didn't like the idea of consequential damages, and I told him we would have to have it this way or we wouldn't have it at all.
Question: How was it left?
Answer: Well, it was left just about that way.
1 Trial Transcript, at 20–21.
Jack Milliken, Vice President of Sales for McNally, recollected the negotiations as follows:
Q. Now, sir, in any of those discussions did any person say to you from Mead Corporation that they would not agree to the terms and conditions of the delivery and completion clause insofar as they provided that you should not be responsible for consequential damages as it is more specifically expressed in the language of that clause?
A. No, sir, they did not.
Q. Mr. Milliken, you have been in court since this case started. You were in court when Mr. Christian described a meeting at which he said that you sat, according to his recollection, at least one seat away from him at which consequential damages were specifically discussed, and he told you that Mead Corporation would not consent to a consequential damage clause exonerating it from damages due to delay. Do you recall any such conversation?

be built in accordance with the terms, conditions and specifications contained in Mead's original bid solicitation, McNally's proposal W–2394, and the modifications hammered out during negotiations.[7] The purchase order explicitly incorporated by reference the terms and conditions of proposal W–2394. However, in the lower left-hand corner was a printed legend that characterized the form as an offer, governed by the conditions listed in fine print on the back of the form,[8] as well as those on the face of the document. Nowhere did Mead's purchase order expressly reject the consequential damage and excess magnetite loss clauses contained in McNally's proposal W–2394. However, among the provisions on the back of the purchase order was Article 19, which read:

> Any rights or remedies granted to the Purchaser in any part of this purchase order shall not be exclusive of, but shall be in addition to, any other rights or remedies granted in another part of this purchase order and any other rights or

> A. I do not.
> Q. Do you have any memory that such conversation could have taken place?
> A. It did not.
> 1 Trial Transcript, at 587.

**7.** Mead's purchase order read, in relevant part, as follows:

> Furnish one coal preparation plant to be in accordance with the specifications titled, "Specifications for Coal Preparation Plant and Related Facilities, Mulga Mine, Mulga, Alabama", addenda Letter # 1, dated 1/23/73, and the terms and conditions stipulated in your Proposal W–2394, dated 3/15/73, and revised 11/15/73. Furnish and install the equipment, materials, and accessories described and specified as required, in addition to certain equipment, materials, and parts furnished by Woodward for coal preparation and related facilities at Woodward's Mulga Mine, located near Mulga, Jefferson County, Alabama.
> The complete project is also to be in compliance with the laws, codes, ordinances, rules and regulations of the State, County, City, and other authorities insofar as they apply. Permissible deviations from the specifications, as set forth in the documents above, are noted in your letters of exception or addenda to Proposal W–2394, as listed:
>
> Letter dated 10/18/73, Re: Exceptions and addenda
> "      "      10/18/73, Re: Revised Prices

remedies that the Purchaser may have at law or in equity in any such instance.

McNally characterizes its bid proposal as an offer which included various exculpatory clauses as part of the "terms and conditions." Under McNally's rationale, Mead's purchase order constitutes the acceptance and confirmation of this offer, incorporating McNally's terms and conditions by explicit reference to the bid proposal. McNally offers two theories why the district court should have construed the contract as including the two exculpatory clauses. First, McNally asserts that its exculpatory clauses merely supplement the pre-existing Mead *force majeure* clause, and therefore, are not inconsistent with Article 19 of Mead's purchase order. Second, McNally argues that any provision in Mead's purchase order that sought to impose liability for consequential damages or excess magnetite loss would constitute a "material alteration" of its offer under Ohio Rev.Code § 1302.10 and would, by operation of law, be excluded from the contract.

> "      "      10/23/73, Re: Noise Control, Noise Exposure Control, Heat Dryer
> "      "      10/29/73, Re: Cancellation Charges
> "      "      11/21/73, Re: Bearing Piles
> "      "      11/30/73, Re: Conveyors; Storage Pile vs Silo, Price
> "      "      12/07/73, Re: Conveyors, Vacuum Pumps
>
> The completed project installation is to be put into a guaranteed performance operation, and warranted, as specified in all the above named documents.
>
> Price: $5,388,366.00 Date Required: As soon as possible
> Terms: Page J.5, Proposal W–2394, as revised 11/15/73. Certificate of Insurance to be furnished.
>
> CONFIRMATION: 11/1/73
> Mr. Jack C. Milliken-HSS-WCC

**8.** Mead's purchase order included the following printed statement on the face of the form:

> This purchase order, which constitutes an offer, includes the terms and conditions on the front and reverse sides. Please read them carefully. By shipping the above goods, or by acknowledging receipt of this order, or by performing the above work, you agree to the terms and conditions; although you are agreeing to said terms and conditions, it is not limited to the foregoing methods. Any different or additional terms or conditions and any proposal, acknowledgment form and any other documents are hereby objected to and superseded by these terms and conditions.

Mead, on the other hand, argues that its purchase order was either the original offer or a counter-offer, noting the conspicuous legend printed on the face of the purchase order which characterizes the form as an offer. Under its theory, McNally's performance was the acceptance. Since McNally failed to take exception to the *force majeure* clause in the original bid solicitation, and accepted the purchase order including Article 19, Mead maintains that McNally agreed to remain liable for consequential damages caused by delayed performance as well as damages resulting from excess magnetite loss.

In evaluating the respective claims of the parties, we first note that on page two of Mead's purchase order, the word "CONFIRMATION" is typed in capital letters. Moreover, there is no dispute that this purchase order followed upon the heels of the negotiations between Mead and McNally regarding McNally's bid proposal. In *Dorton, supra*, at 1166, Judge Celebrezze noted:

> [U]nder the current "battle of the forms," each party typically has a printed form drafted by his attorney and containing as many terms as could be envisioned to favor that party in his sales transactions. Whereas under common law the disparity between the fine-print terms in the parties' forms would have prevented the consummation of a contract when these forms are exchanged, Section 2–207 recognizes that in many, but not all, cases the parties do not impart such significance to the terms on the printed forms.

Hence, we cannot accept that Mead's standard purchase order form, with its fine print "offer" term, is dispositive of the fundamental and complex question in this appeal: what constituted the offer and what was the acceptance? Rather, we repair to the record and the totality of the circumstances to make a fair and informed decision on this matter.

Upon review of the record and the case law under the U.C.C. it becomes apparent that we need not be wedded to one of the several theories offered by the parties on appeal. However, the record, judicial decisions under the U.C.C. and common sense clearly compel a finding that McNally's proposal W–2394 was an offer which was accepted by Mead through its purchase order. *See Idaho Power Co. v. Westinghouse Electric Corp.*, 596 F.2d 924 (9th Cir. 1979); *Wisconsin Electric Power Co. v. Zallea Bros., Inc.*, 443 F.Supp. 946 (E.D.Wis. 1978), *aff'd* 606 F.2d 697 (7th Cir. 1979); *Earl M. Jorgensen Co. v. Mark Construction, Inc.*, 540 P.2d 978, 17 UCCRS 1126 (Haw.1975).

Under U.C.C. § 2–204(1), "A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." U.C.C. § 2–206(1) states that "Unless otherwise unambiguously indicated by the language or circumstances (a) an offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances . . . ."

McNally and others sent their proposals to Mead offering various prices and delivery schedules for the construction project. Mead reviewed the various bid proposals, and by its own admission, settled upon McNally as the desired manufacturer.[9]

---

**9.** Carl Christian, Vice President of Mead Corporation, testified as follows at trial:

> Q Now, after you received McNally's proposal with the exceptions and after you had received the other proposals, what happened next?
> A We were ready to begin negotiations for the awarding of the contract, awarding of the job.
> Q You say we. Who are you talking about?
> A Mr. Savage, our Engineer; Mr. Grover, our Vice President, and myself.

> Q All right. Did you meet with McNally for that purpose?
> A Yes, sir, we did.
> Q Who did you meet with?
> A We met with Mr. Jack Milliken, Mr. Tom Montgomery, and there may have been others.
>
>     \*    \*    \*    \*    \*    \*
>
> Q Tell me exactly what you recall of that discussion. I want every detail you recall of that.
> A We discussed every item item-for-item as we went down the page together, and any

Mead entered into extensive negotiations with McNally, reviewing the original bid solicitation and the bid proposal. Subsequently, Mead sent McNally a purchase order, incorporating the terms and conditions of McNally's proposal W–2394 as well as the specifications for the coal washing facility. The purchase order clearly indicates an assent to the terms as specified on the face of the form and contains all the necessary details for performance. In fact, McNally began performance after receipt of this purchase order. In commercial transactions of this type, this course of conduct can only be held to constitute an acceptance.[10] Thus, Ohio Rev.Code § 1302.10 would exclude any additional terms in Mead's purchase order (the acceptance) that materially altered McNally's proposal W–2394 (the offer). If Article 19 of Mead's purchase order, or the *force majeure* clause contained in the original bid solicitation, were construed to impose liability contrary to McNally's exculpatory clauses, it would work a material alteration of the offer and would be excluded from the contract under Section 2–207 or Ohio Rev.Code § 1302.10 unless otherwise agreed to by McNally.[11]

objection that was raised we talked about and discussed.

\* \* \* \* \* \*

Q Did you in this instance submit or change any language from that prepared [for the purchase order] by Mr. Savage or by Mr. Bledsoe and approved by Mr. Savage?
A I don't remember that I did.
Q You just don't remember?
A No, sir.
Q You did sign it [the purchase order], did you not?
A Yes, sir. . . .
Q Mr. Savage approved it, did he not?
A Yes, sir. . . .
Q Mr. J. V. Bell approved it, did he not?
A Yes, sir. . . .

\* \* \* \* \* \*

Q And Mr. Buddy Jones approved it, too, did he not?
A Yes. . . .
Q And Mr. D. T. Foust approved it also at that time?
A Yes. . . .

1 Trial Transcript, at 19–20, 48–49.

Mr. Savage also involved in the contract negotiations, testified at an oral deposition as follows:

Q At some point in time, McNally-Pittsburg became the only remaining candidate or prime candidate to construct the project?
A Right.
Q Do you recall about when that would have occurred?
A I would say that it was late summer, '73.
Q Did you notify them at that time that they were the candidate to construct the project?
A No, I am trying to remember, and as I remember it, again, in response to a call from them, they wanted to know the situation. I believe we set up a date with them in which Mr. McNally himself in conjunction with Jack Milliken came down and at that time, I believe it was the first time that they knew that they tended to be favored with the job.
Q Now, what time would this have been when this meeting took place?
A Again, I am vague, but September or October of '73, somewhere along in there.
Q Were you present at this meeting?
A Yes.
Q What took place at the meeting?
A We did a little verbal negotiating as good business, to see if you can do any better than the situation is, and we got a few points and I think they didn't concede any more than they probably would anyway. . . . This was the type thing, I don't remember all of the details, but it was a little give and take on both sides, at which time, bending the legal contract awarding, and the finalization of wording and everything, we, I believe, at this time, we gave them an order number on which they could proceed in case of cancellation, they were protected up to a point of any monies they might expend.

At such time, a formal order was placed with them.

2 Trial Transcript, at 1320–21.

**10.** The contract negotiations between Mead and McNally are similar to those described in *Wisconsin Electric Power Co., supra*, where the court held that the purchase order sent by the buyer was an acceptance of the manufacturer's bid proposal.

**11.** We believe that any attempt to impose consequential damage liability on McNally would constitute a material alteration of the offer. Whether an additional term in the acceptance works a material alteration must be determined in light of the circumstances of each case. *N & D Fashions, Inc. v. DHJ Industries, Inc.*, 548 F.2d 722 (8th Cir. 1977). Mead itself notes that the parties hotly disputed the question of damage liability. By their own admissions, each party considered consequential damage liability to be a material and crucial issue. Recognizing that at least $1 million of damages could be considered "consequential," we are convinced that the attempt to impose such liability on McNally can be fairly characterized as a "mate-

However, even under Mead's theory of this case, we cannot agree that McNally was liable for consequential damages or excess magnetite loss under the contract. If Mead's purchase order did constitute either the initial offer or a counter-offer, the fact remains that this offer explicitly incorporated by reference all of the conditions and terms of McNally's proposal W–2394 as modified, which would include the damage limitation provisions. Mr. Christian testified that no written document or exception to the McNally exculpatory clauses was ever drafted;[12] thus there is no indication that Mead's offer sought to exclude McNally's exculpatory clauses from the contract as formed. This is particularly significant since both parties acknowledge that the exculpatory clauses were discussed.

Without sufficient evidence, even parol evidence, that Mead intended and McNally agreed to eliminate the exculpatory clauses from the contract, the plain language of the contract and Section 2–207 of the Uniform Commercial Code fix the rights of the parties. The prior oral negotiations only indicate that a dispute had arisen at the time of the discussions; this fact is not determinative of the parties' ultimate agreement once the purchase order was sent and performance began.[13]

Mead argues that McNally's failure to take exception to the *force majeure* clause, as contained in Mead's original bid solicitation, and its failure to highlight the exculpatory clauses violated the terms of the bid solicitation. Therefore, Mead asserts that McNally's exculpatory clauses cannot be included in the contract as formed.

We find this omission to be of little consequence in resolving the contract dispute. The request for exceptions functioned primarily as a method of giving notice to Mead so the new or disputed terms could be discussed. By Mead's own admission, such negotiations occurred. This case does not involve an instance where one party willful-

---

rial alteration." *See Air Products & Chemicals, Inc. v. Fairbanks Morse, Inc.*, 58 Wis.2d 193, 206 N.W.2d 414, 12 UCCRS 794 (1973).

12. Carl Christian testified:

Q However, there is no reference at all in this letter to any such discussion or any such exception as to the terms and conditions exonerating McNally from consequential damages, is there?
A I don't see any.
Q So, if that was the subject of discussion at that meeting, there was nothing said about it in this report, was there?
A I don't see that it is in here.
Q Didn't you consider the subject of consequential damages about the most important thing that was discussed at whatever meeting this was?
A Yes, sir, it was important.
Q Have you found anywhere that that was memorialized by the letter either to or from Mead to McNally?
A Mead Corporation never agreed to limit the liabilities of the contract.
Q Sir, my question was whether this discussion that you had was ever memorialized in a letter similar to the letter of October 18 in which the parties set forth the discussions that they had?
A Not in a letter. Our contract specifies terms, conditions, general conditions, and those govern. That is our contract. Any exceptions given would have to be given in writing by McNally.

Q I understand your legal interpretation of the contract, Mr. Christian. What I am asking you is much simpler than that. I am just asking you when you had this most important discussion, nobody ever bothered to write anybody else about it and memorialize it in writing?
A No, sir, not after this meeting.
1 Trial Transcript, at 87–88.

13. *See* notes 6, 9, *supra*. If we construe Mr. Christian's testimony most favorably to Mead, *see* note 9, *supra*, we might find a tentative agreement to eliminate McNally's consequential damage provision from the contract. At the same time, the ambiguity of Mr. Christian's testimony, viewed in light of Mr. Milliken's testimony, also suggests that both parties, anxious to consummate the contract, may simply have discontinued the debate without reaching agreement on whether to include or reject the language. Probably more than any other, it was this dispute which led the trial judge to submit the question of the construction of the contract to the jury.

However, construing this language most favorably to Mead, we must nonetheless conclude that any prior oral agreement or disagreement can be of no legal effect in view of the unequivocal language of Mead's subsequent purchase order, wherein it expressly accepted "the terms and conditions" of McNally's bid proposal without noting any exception to the liability provisions therein.

ly buries an advantageous provision in its offer and succeeds by trick in placing the other party in a disadvantageous position. There is no surprise in this case; Mead was fully apprised of McNally's effort to limit its liability. As we have noted, the most logical if not inescapable conclusion from the trial testimony is that both parties walked away from this dispute with the hope that it would not become an issue during the course of contract performance.

Finally, we observe that Mead's *force majeure* clause and Article 19 are not, in any event, inconsistent with McNally's exculpatory clauses. These provisions can co-exist within a single contractual instrument without conflict. Thus, it is not clear that McNally understood, or was even required, to note its exception to Mead's *force majeure* clause and highlight its exculpatory clauses.

■ We observe that Mead's theory of the case ventures close to the territory of U.C.C. § 2–207(3); however, neither party briefed or argued this Code provision on appeal. We note that even in the event this case fell within that subsection of the "battle of the forms" provision, McNally's exculpatory clauses would still become part of the contract. Under U.C.C. § 2–207(3), if the writings of the parties do not evidence a contract but the parties perform as though a contract existed, the U.C.C. creates a binding contract by operation of law, consisting of terms to which the parties' forms are in accord as well as supplementary terms found in other provisions of the Code. *See* White & Summers, *Uniform Commercial Code* 29 (1972).

In *Dorton, supra,* our court observed that in order for a written response to an offer to constitute a non-binding counter-offer, and thereby bring into operation Section 2–207(3), "it is not enough that [the response] is expressly conditional on additional or different terms; rather, an acceptance must be *expressly* conditional on the offeror's *assent* to those [additional] terms." 453 F.2d at 1168. From our reading of Mead's purchase order, its acceptance was not made so expressly conditional. Nor do we

agree that Mead's purchase order was the original offer. However, even if such were the case, McNally's exculpatory and damage ceiling provisions would become part of the contract as formed under U.C.C. § 2–207(3) since Mead's purchase order explicitly incorporates the terms and conditions of McNally's proposal W–2394, including these provisions.

■ In reaching our decision on this issue, we recognize that in *Bahamas Agricultural Industries, Ltd. v. Riley Stoker Corp.,* 526 F.2d 1174, 1179 (6th Cir. 1975), we held that under Ohio law, "it is within the province of the jury, and not for the court, to ascertain and determine the intent and meaning of the contracting parties in their use of uncertain and ambiguous language." However, that case is distinguishable from the present appeal. First, *Bahamas Agricultural Industries* did not involve a question of contract law under the U.C.C. Absent the Code, questions of contract formation and intent remain factual issues to be resolved by the fact-finder after careful review of the evidence. However, the Code provides rules of law, and Section 2–207 establishes important legal principles to be employed to resolve complex contract disputes arising from the exchange of business forms. *Dorton, supra; Rite-Fabrics, Inc. v. Stafford-Higgins Co., Inc.,* 366 F.Supp. 1, 13 UCCRS 588, 596 (S.D.N.Y.1973). Section 2–207 was intended to provide some degree of certainty in this otherwise ambiguous area of contract law. In our view, it is unreasonable and contrary to the policy behind the Code merely to turn the issue over to the uninformed speculation of the jury left to apply its own particular sense of equity.

More important, however, *Bahamas Agricultural Industries* involved a case where reasonable minds could differ as to the interpretation of the *actual contract language*; the ultimate legal result turned upon which interpretation the jury adopted. Here, the dispute involves more a matter of *contract formation* rather than ambiguous contract language. Certainly, McNally's exculpatory clauses were not ambiguous;

and even if reasonable minds could differ as to the facts, we have demonstrated that any reasonable interpretation leads to but one result on the issue of contract formation and content under the Code. McNally successfully limited its liability for consequential damages from delay and excess loss of magnetite. In these circumstances, the question was no longer one for the jury to decide.

## II.

## DAMAGES

Although we have resolved the dominant legal question of contract formation in favor of McNally, it by no means follows that McNally is thereby automatically entitled to the relief it seeks in this appeal. McNally argues that of all the damages sought by Mead, only $237,700 is recoverable: $75,000 representing the maximum amount recoverable for excess magnetite loss, and $162,700 which represents capital outlays to make the coal washing plant operate as warranted.

The matter, however, is not so simple. We first note the difficulty in drawing a clear distinction between "consequential damages" and damages recoverable under the general remedy provisions of the Code.[14]

14. The Uniform Commercial Code provides several remedies for a buyer who suffers a breach of contract. These include: cancellation (§ 2–711), "cover" which includes purchasing substitute goods in the market without unreasonable delay (§ 2–712), recovery of damages for non-delivery or repudiation (§ 2–713), recovery of damages for breach of contract because of defective or non-conforming goods (§ 2–714), specific performance or replevin if unique goods are involved (§ 2–716), or deduct damages caused by the breach from any balance of the price still outstanding (§ 2–717).

Of particular concern to this case are Sections 2–712, 2–714 and 2–715. As noted above, Section 2–712 of the Code permits Mead to "cover" in any commercially reasonable manner in the market place to secure alternative goods or services necessitated by the breach of the contract. Mead essentially effected cover for the allegedly defective scales by obtaining alternative weighing services.

Section 2–714(1) of the Code allows Mead to accept non-conforming goods and "recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable." According to subsection (2), "The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount." Finally, subsection (3) provides that "In a proper case any incidental and consequential damages under the next section may also be recovered." Since Mead "accepted" the allegedly defective coal washing plant, it appears that Mead is entitled under this section of the Code to recover any direct damages or costs incurred in repairing the defects, as well as any consequential and incidental losses or costs resulting from the defects, absent any exculpatory provisions inuring to McNally's benefit.

Section 2–715 defines "incidental damages" as "any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach." "Consequential damages" include "(a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise. . . ."

Comment 3 to this section indicates that consequential damage relief will be liberally applied:

In the absence of excuse under the section on merchant's excuse by failure of presupposed conditions, the seller is liable for consequential damages in all cases where he had reason to know of the buyer's general or particular requirements at the time of contracting. It is not necessary that there be a conscious acceptance of an insurer's liability on the seller's part, nor is his obligation for consequential damages limited to cases in which he fails to use due effort in good faith.

Particular needs of the buyer must generally be made known to the seller while general needs must rarely be made known to charge the seller with knowledge.

Any seller who does not wish to take the risk of consequential damages has available the section on contractual limitations of remedy.

Comment 4 places the burden of proving consequential damages on the buyer, but notes that mathematical certainty is not required. "Loss may be determined in any manner which is reasonable under the circumstances."

Thus, the Code can be construed as calling for the liberal application of consequential damage relief in order to make the aggrieved party whole and place him in as good a position as he would have attained absent the breach. This could include lost profits. In *Lewis v.*

That this was recognized by the parties in the court below is evident from the record.[15]

*Mobil Oil Corp.*, 438 F.2d 500, 510 (8th Cir. 1971), the court noted:

> Where a seller provides goods to a manufacturing enterprise with knowledge that they are to be used in the manufacturing process, it is reasonable to assume that he should know the defective goods will cause a disruption of production, and loss of profits is a natural consequence of such disruption. Hence, loss of profits should be recoverable under these circumstances.
>
> However, we recognize that the Code places limitations on liability, based on the seller's actual or constructive knowledge of possible consequential damages, and based on the buyer's ability to cover in good faith. Moreover, the Code allows a seller to include exculpatory clauses in a sales contract to limit consequential damage liability.

15. During a bench conference, it became evident that Judge Rubin sought an agreement between the parties as to those damages that were consequential and those that were not.

THE COURT: By the way, if you gentlemen agree as to which are consequential damages and which are not, I will be happy to list them (laughter). I really hadn't thought until I said it about how funny it is. I will hear from you first, Mr. Gilliam.

\* \* \* \* \* \*

THE COURT: Let me simplify it because your point is well taken. I was not trying here to limit what are consequential damages. What I was trying to do was draw a distinction as to what we have in this case.

\* \* \* \* \* \*

MR. GILLIAM: You have made some references to that earlier. You get into another section on your charge as to the interrogatories, but let me make it clear what I think are the areas of consequential damages and where are the other areas so that we have it clear.

First of all, I believe what we talk about as consequential damages are appropriately considered only as the loss of profits and earnings. That is because of $9\frac{2}{3}$ days down time. . . .

\* \* \* \* \* \*

And one other item which is the sales price of the premiums.

Now, those two, I would say, would fall within the area of consequential damages, but let's take freight charges, and we have a contract to perform. We have the obligation in order not to be liable under our contract passing Mr. Clarke's question on that, to get the coal to Sumitomo. So, this is in a sense cover, if you will, which is not consequential damages. Freight is not a lost profit. It is an expense of cover.

Suffice it to say that the attorneys never agreed upon what particular damages were

So, generally speaking, Your Honor, consequentials fall into the area of profits and cover falls into the area of expenses.

\* \* \* \* \* · \*

THE COURT: What I am trying to figure out here is I must tell the jury that there is a difference. I am perfectly satisfied not to refer here to consequential damages if that will help the problem, but it seems to me that there are damages from a delay, and there are damages for failure to meet warranties, and this is all that I am trying to draw to their attention.

\* \* \* \* \* \*

MR. FARUKI: What our number 26 does on Page 44 is to simply state the rule of Hadley versus Baxondale [sic] which is the law in Ohio, and you can see the authority on Page 46 at the top of the page is a direct quote from the Supreme Court of Ohio's formulation of the traditional rule of damages.

So, that is the basic instruction on damages which we have submitted to Your Honor.

THE COURT: Well, all right. Are you suggesting that the damage that fully and reasonably may be considered to arise naturally, that that is the breach of contract damages and the other breach of warranty, or are they both breach of contract?

MR. FARUKI: Those are both breach of contract.

\* \* \* \* \* \*

THE COURT: . . . The applicability of Hadley versus Baxondale [sic] is no problem. I am wrestling with a little bit different problem. Maybe I don't even need this.

MR. FARUKI: That is my impression.

THE COURT: Maybe I should just stay away from this.

MR. GILLIAM: I believe that is the problem, and that is why I have marked it as I have here to eliminate it. I think you are likely to get a question from the jury after you submit these instructions in writing of what are consequential damages.

THE COURT: That is exactly what I am afraid of, and I can anticipate that coming back.

Now, my problem is this: If they accept his clause, they are going to reach one result, and if they accept mine, they are going to come up with another result, and that is a real firecracker.

Are you gentlemen in agreement that I should not give Charge 5070 because I am perfectly satisfied not to, which would mean that I explain to them contract damages and breach of warranty damages. I have a little hesitation here. I think they need something to explain that there is a difference between delay and a failure to complete.

consequential. Nor did the court make any such determination. In fact, it appears to have been expressly agreed that the jury would resolve this complex damage dispute, but without any instruction as to the meaning of "consequential." Therefore, insofar as the question was one for the jury to decide, the parties effectively and intentionally precluded the jury from resolving the issue with the precision that McNally now seeks from this court.

As noted at the outset, McNally asserts that it is only liable for $75,000 of excess magnetite loss and $162,700 for capital outlays. According to McNally, all other damages are barred by the exculpatory clauses, disclaimers of warranty, or not otherwise caused by its breach.

For its part during the trial, Mead acknowledged only two items of damages as consequential: (1) those characterized as loss of profits and earnings for 9⅔ days of coal mine downtime amounting to $199,000 (see item 1, supra at p. 1198), and (2) the premium on certain coal sales then secured under preexisting coal supply contracts, an item which was variously described as coming to $788,747, or $719,000 (see item 2,

supra at p. 1198). However, Mead specifically asserts that its claim for excess field labor escalation charges, in the amount of $341,140.67 (see item 11, supra at p. 1198), cannot be considered consequential.[16] Thus, Mead argues since this sum, when combined with the two damage items acknowledged by McNally, exceeds $510,000, there was ample evidence of non-consequential damages to support the jury's award in this amount.

■ In response, McNally argues that whether the field escalation damages are consequential is irrelevant, since those charges were part of the disputed contract balance and litigated in McNally's counterclaim; therefore, they could not be the basis for a separate damage claim by Mead. While this may be technically true, Mead presented the field escalation charges to the jury as a part of its own claim. Since we cannot know precisely what items made up the $510,000 award, we cannot, of course, determine whether the jury took into account the field escalation charges. However, without expressing an opinion as to McNally's liability for these costs, we agree these charges would not be consequential.[17]

---

MR. CLARKE: I did have a number of suggestions for this Charge 5070, but I think the best solution would be the one you have just proposed, not to give it.
MR. GILLIAM: I would agree with that.
THE COURT: Let's not give it then.
2 Trial Transcript, at 1399–1404.

16. From our review of the record, it appears that "excess field labor escalation charges" were costs incurred for additional labor and materials necessitated by McNally's delay in completing the construction of the coal washing plant.

17. We refer to our discussion of consequential damages under the Code, supra note 14, and point out that Section 2–714 differentiates between damages "resulting in the ordinary course of events from the seller's breach" § 2–714(1) and "any incidental and consequential damages under the next section ...." § 2–714(3).
We consider the escalation charges to fall within the concept of damages "resulting in the ordinary course of events from the seller's breach" (namely, McNally's failure to complete the plant on schedule), rather than consequential damages defined as "any loss resulting from general or particular requirements and

needs of which the seller ... had reason to know." § 2–715(2)(a). The escalation charges were not "losses" as such, but expenses incurred as a direct result of the failure to complete. Moreover, as pointed out by White & Summers, Uniform Commercial Code 318–21 (1972), consequential damages usually encompass lost profits expected under contracts between the aggrieved party and third parties, and other expenses not incurred in order to cure the immediate defect in performance. In this regard, the element of "proximity" is inherent in consequential damages. See A. T. S. Laboratories, Inc. v. Cessna Aircraft Co., 59 Ohio App.2d 15, 391 N.E.2d 1041, 1046 (1978). Indeed, the definition of consequential damages under the Code also includes "(b) injury to person or property proximately resulting from any breach of warranty." § 2–715(2)(b) (emphasis added). See also Note, Economic Loss in Products Liability Jurisprudence, 66 Colum. L.Rev. 917, 918 (1966), cited in Nobility Homes of Texas, Inc. v. Shivers, 557 S.W.2d 77, 78 n. 1 (Tex.1977), wherein the author states:
Economic loss may be either direct or consequential. The distinction between direct and consequential economic loss has been summarized as follows:
Direct economic loss may be said to encompass damage based on insufficient prod-

█ One of the most hotly disputed damage claims was based upon the alleged failure of a loading scale furnished by McNally pursuant to a subsequent agreement. Mead claimed that the scale was deficient and could not meet the certification criteria of the Southern Weighing and Inspection Bureau.[18] Since the Bureau refused to certify the scale, Mead was forced to incur substantial costs in obtaining alternative weighing services. Mead made claims for additional costs of weighing (see item 5, supra at p. 1198), for future additional weighing costs until a replacement scale could be obtained (see item 12, supra at p. 1198) and for 50% of the $294,785 replacement cost of the scale (see item 9, supra at p. 1198). In addition, at least part of Mead's claim for freight (see item 3, supra at p. 1198) and loading (see item 4, supra at p. 1198) represented costs of cover, incurred when Mead transported the coal to the old washing facility some twelve miles away in order to have the coal weighed.[19]

McNally denied this damage claim, pointing to what it characterizes as an express disclaimer of warranty contained in its offer to furnish the scale. The alleged disclaimer reads:

> Scale will be installed in accordance with Southern Weighing and Inspection Bureau; however, we cannot guarantee acceptance of installation by all parties concerned. Necessary material tests, spare parts, and service contracts to be furnished by the purchaser.

McNally argues that the scale was precisely what Mead ordered, and that it was, in fact, "installed in accordance with Southern Weighing and Inspection Bureau." McNally maintains that any failure was not because of a defect in the scale itself, but because the scale was not suited for Mead's intended purposes, a fact of which Mead was aware. Thus, McNally argues that it expressly disclaimed any guarantee that the installation would be accepted "by all parties concerned" including the Southern Weighing and Inspection Bureau.

Mead disagreed with this interpretation, arguing that the phrase "installed in accordance with the Southern Weighing and Inspection Bureau" constitutes a promise that the scale would meet the certification standards of that Bureau. Since a number of Mead's coal customers would be charged according to the scale's operation (including an important Japanese company), Mead argues that the disclaimer of guaranteed acceptance "by all parties concerned" only operated to absolve McNally from any liability if those customers should disagree as to the accuracy of the scale or insist upon some standard other than Bureau certification.

█ In contrast to the clear language in the McNally offer as to consequential damage liability, the foregoing disclaimer presents the classic type of ambiguity which *Bahamas Agricultural Industries, supra*, reserves for the jury's resolution. And, in

---

uct value; thus, direct economic loss may be "out of pocket"—the difference in value between what is given and received—or "loss of bargain"—the difference between the value of what is received and its value as represented. Direct economic loss also may be measured by costs of replacement and repair. Consequential economic loss includes all indirect loss, such as loss of profits resulting from inability to make use of the defective product.
Thus, we believe the field escalation charges would not qualify as consequential damages.

18. As we gather from the record, the load out scale system consisted of a conveyor belt and Merrick scale. A feeding apparatus pushes the coal onto a belt, which carries it and dumps it into the scale. The Southern Weighing and Inspection Bureau required, as a prerequisite

for certification, that the amount being sent into the scale by the belt be within 50–98% of the scale's capacity. It appears that one of the problems encountered with the load out scale system was that it fed the coal onto the belt in a surging manner, causing an uneven distribution. When the coal was sent into the scale, the scale oscillated causing the recorded weight to be inaccurate.

19. It is not for this court to determine whether these damages arise from a breach by McNally. However, we are satisfied that in any event, they would not come under the definition of consequential damages. Rather they represent damages falling within the concept of "cover." See U.C.C. §§ 2–711 and 2–712, discussed supra, notes 14, 16.

contrast to the issue of contract formation discussed above, the damages awarded would depend upon the jury's interpretation of this alleged disclaimer. If the jury accepted Mead's interpretation, it could award those damages Mead claimed to be a proximate result of the defective scale. Or the jury may have awarded only partial relief to Mead, believing that some of the costs incurred in the effort to cover were unreasonable. *See* U.C.C. § 2–712(1) and Comment 2. It was within the jury's province to make an award on this basis and Mead does not cross-appeal or otherwise seek to have our court set aside the judgment. Given the ambiguity, we refuse to speculate and displace the jury's award without greater certainty as to the error alleged by McNally.

## CONCLUSION

Since McNally has failed to demonstrate that any portion of the judgment represented damages which could not properly have been assessed against it, we are obliged to affirm the jury award, notwithstanding our holding that there was error in submitting the question of contract formation under Section 2–207 or Ohio Rev.Code § 1302.10 to the jury. The foregoing discussion demonstrates that the $510,000 judgment cannot be said, as a matter of law, to have included any consequential damages or other damages we find to be excluded under the contract.

McNally did not seek any specific interrogatory or intelligence by way of special verdict from the jury, which might enable the parties and this court to determine the exact basis for the verdicts actually rendered. Thus, we are left to speculate what

the jury might have done regarding that portion of Mead's damage claim that, under the contract as we have found it, was properly before the jury. The judgments rendered on both the principal claim and the counterclaim indicate, if nothing else, that the jury was not inclined to accept at face value either party's position, but accepted and rejected such portions of each as they credited in accordance with their view of the proofs and credibility of the witnesses. If the matter of damages remains uncertain, it is because the parties, through their trial tactics, created this uncertainty.[20]

No other relief has been sought. McNally did not move for a new trial in the district court, nor did it make any such request on appeal. It thus appears to us that McNally, if it cannot receive a damage reduction as a matter of law, is content to bear those ills it has than fly to others that it knows not of, should it seek a new trial.[21]

Our review has covered not only the briefs filed by the parties in this appeal, but also the entire transcript of the trial, including the lengthy discussions of counsel with the district judge in connection with the various motions for directed verdict and requests for jury instructions. We have closely examined many of the exhibits introduced at trial. Although we have considered ourselves bound to point out what appears to have been an error in the trial court's treatment of U.C.C. § 2–207, we are also bound to observe that on balance, that error did not deny the parties a fair trial or, in the language of Rule 61, Federal Rules of Civil Procedure, "to have affected the substantial rights of the parties" in such a way as to persuade us to grant *sua sponte* a new trial. .

Affirmed.

---

**20.** In this regard, the following observation, made by Judge Rubin to the attorneys on the issue of damages, is illuminating:

I am going to make a gratuitous remark to you. It is impossible for either of you at this point to stand back and look at this objectively. Will you accept my word for it that you have created in my opinion an absolute nightmare. I don't believe that this jury at this point has anything to go on other than a wild guess, and if that is what you wanted, you succeeded in doing it.

2 Trial Transcript, at 1267–68. Our agreement with Judge Rubin on this observation reinforces substantially our decision to leave the judgment undisturbed.

**21.** *See Hamlet*, Act III, Scene 1.

While Mead was awarded $510,000, this was only 19% of Mead's claim as presented at closing argument. McNally challenges only $270,-000 of the award, which is approximately one-tenth the amount claimed by Mead.