[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 24-10335

_____

SWEET ADDITIONS INGREDIENT PROCESSORS, LLC,

                                        Plaintiff-Counter Defendant-Appellant,

*versus*

MEELUNIE AMERICA, INC.,

                                        Defendant-Counter Claimant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 9:21-cv-81141-AHS

_____

Before ROSENBAUM, NEWSOM, and MARCUS, Circuit Judges.

PER CURIAM:

First-year law students might want to take note: this dispute may resemble a question on an upcoming contracts exam.

In September 2019, Defendant-Appellee Meelunie America, Inc. ("Meelunie"), and Plaintiff-Appellant Sweet Additions Ingredient Processors, LLC ("Sweet Additions"), agreed to a fixed-price sales contract. In that contract, Meelunie agreed to supply Sweet Additions with organic tapioca starch[1] for the 2020 calendar year.

Shortly into the deal's term, the COVID-19 pandemic started to interrupt global supply lines. And although the parties worked through some initial performance difficulties, by the beginning of 2021, Sweet Additions had yet to receive the full quantity of tapioca starch Meelunie agreed to provide under the contract. Meelunie represented that supply difficulties were likely to last through the next several months but that, potentially, it could deliver the remaining tapioca starch under the contract if Sweet Additions would shoulder higher shipping costs. Sweet Additions declined, contracted with an alternative tapioca starch provider, and declared that Meelunie materially breached the contract.

---

[1] Tapioca is the starch extracted from dried yuca (or cassava) plants and is a popular ingredient in dishes, desserts, and even drinks—like boba (or bubble tea)—across the world. *See* Melissa Clark, *Tapioca Moves Beyond Its Pudding Phase*, N.Y. Times, Mar. 3, 1999, at F3.

Then Sweet Additions filed this lawsuit to recover the benefit of its bargain. During the litigation, Meelunie leveled counterclaims.

The parties proceeded to a bench trial. In the end, the district court entered a $1,409,490.61 judgment in Meelunie's favor for the outstanding invoices that Sweet Additions had not yet paid. The district court also rejected Sweet Additions's claims. The court concluded the parties' contract precluded Sweet Additions from recovering damages, even if Meelunie in fact breached. Specifically, it held the parties' contract incorporated Meelunie's generic terms and conditions. And from those terms and conditions, it relied on a limitation of liability that it interpreted to bar the cover costs Sweet Additions hoped to recover.

So now, on appeal, we must decide two issues: (1) whether the sales contract incorporates Meelunie's generic terms and conditions and (2), if so, whether the terms and conditions' limitation of liability precludes Sweet Additions from recovering any damages.

After careful review, and with the benefit of oral argument, we conclude the parties' contract incorporates the terms and conditions. But we hold that the limitation of liability does not preclude Sweet Additions from recovering any damages in this suit. Instead, it bars recovery of only special consequential, incidental, or exemplary damages. So we vacate the district court's judgment and remand the case for further proceedings consistent with this opinion.

## I.    BACKGROUND

### A.  Factual Background

On September 16, 2019, the parties entered a single-page sales contract. *See* App'x A ("Sales Contract"). Meelunie agreed to supply Sweet Additions with nearly 20 million pounds of organic tapioca starch ("tapioca starch" or "product") in the 2020 calendar year. *Id*. This, however, was not the first contract between the parties; Meelunie began supplying product to Sweet Additions about seven years earlier, in around 2012.

The Sales Contract required Meelunie to load the tapioca starch into 360 containers weighing 55,115 pounds each. It also specified the price: $40.80 per 100 pounds, for a total value of the contract at around $8 million. *See id*. The contract prescribed several other terms as well: delivery was to be made in Minneapolis, Minnesota; the shipments were to be made between January and December 2020; and payment was to be made within forty-five days of invoice, which Meelunie typically included with each shipment. But perhaps most importantly for this dispute, the contract also "confirm[ed]" that Meelunie "SOLD to [Sweet Additions] on [its] general conditions," that "[o]n all [Meelunie's] Sales contracts, [Meelunie's] General Sales conditions apply," and that "[a] copy of these conditions can be obtained upon request." *Id*.

Although the Sales Contract called for payment within forty-five days of an invoice, Meelunie extended Sweet Additions credit for its purchases. Over the course of the parties' relationship,

Sweet Additions enjoyed a $1 million credit limit, which represented the total amount of exposure at any one time that Meelunie would allow Sweet Additions's accounts receivable to reach. The limit began in February 2019. Insurance backed it. And so did Meelunie's general terms and conditions. *See* App'x B ("T&Cs").

Under the T&Cs, Meelunie could charge buyers who had not timely paid an interest rate of 1.5% per month (18% per year) or the maximum lawful rate, whichever was less. *Id.* § 3. So when, under a prior contract, Sweet Additions used the credit Meelunie extended, Meelunie informed Sweet Additions of impending interest charges.

In May 2019, Meelunie emailed Ken Valdivia, Sweet Additions's president and CEO, and Deborah Higgs, Sweet Additions's controller and head of accounting, warning that Meelunie would soon start charging interest on past-due invoices under its "sales terms and conditions," which it attached to the email. Meelunie began charging Sweet Additions interest for overdue payments.

And continuing into 2020, Meelunie emailed Higgs or her accounting assistant, Samatha Swiderski (with a copy to Valdivia), with interest invoices, attaching the T&Cs to those messages, too. Sweet Additions paid those interest invoices at the rate that the T&Cs contained, so Meelunie kept delivering tapioca starch to Sweet Additions.

The parties contemplated delivery of eight containers of tapioca starch per week over the course of 2020. But Meelunie

struggled to adhere to that schedule.  And several shipping delays throughout 2020 and 2021 soured the parties' relationship.

The struggles began in early 2020.  In all of February, Sweet Additions received only seven containers, well short of the eight per week it anticipated.  Meelunie attributed these delays to a factory shutdown in Taiwan and a labor strike at the port in Vancouver.  All in all, the product shortfall amounted to about 1.3 million pounds in February and March 2020.

Sweet Additions contended that these delays harmed its fixed costs, profits, and deliveries to its customers.  Valdivia estimated the company lost $450,000 in February 2020 because of nondelivery.

So in March 2020, he emailed Meelunie his concern that Thailand was "imposing [a] broad lock down" because of COVID-19.  He asked Meelunie to ship "at least 6 months' worth of inventory asap."

The parties made some progress after Valdivia initiated negotiations.  Meelunie increased Sweet Additions's credit limit to $1.5 million and agreed not to charge interest for 90 days.  In return, it asked Sweet Additions to create a "firm payment plan" to keep it within credit limits.  But Sweet Additions failed to respond with a plan.  So Meelunie initiated its own "risk control" measures that governed for the rest of the parties' relationship: Meelunie shipped tapioca starch to a warehouse, where it remained until Sweet Additions paid to receive it.

24-10335                Opinion of the Court                7

Meelunie delivered product without incident in the second, third, and fourth quarters of 2020. And Sweet Additions received all the product it requested for the calendar year. Still, Sweet Additions did not seek to obtain the full contracted amounts; by December 22, 2020, roughly 7.5 million pounds of tapioca starch remained on the contract.

In 2021, shipping problems recurred. Meelunie notified Sweet Additions in January that it was encountering difficulties transporting tapioca starch. It projected that those difficulties would last through the middle of the year. Meelunie attributed the disruption to COVID-19 and the corresponding increase in shipping prices. In particular, Meelunie's shippers were failing to honor their negotiated tender rates for freight. Instead, they asked Meelunie to pay the day's prevailing rate ("spot rates"). So Meelunie asked whether Sweet Additions would absorb the higher rates. Sweet Additions declined.

The end of the parties' relationship was all but imminent at that point. Meelunie did not pay the spot rates because it claimed it would not have been commercially feasible to do so. And while Sweet Additions proposed other ways to ship the product—like air-shipping it in bulk and holding six months' stock in a warehouse—Meelunie thought that idea was commercially impracticable. So also in January 2021, Meelunie told Sweet Additions that it would be unable to perform according to the fixed-price contract for the second half of the year.

In response, Sweet Additions sought an alternative provider. And in March 2021, Sweet Additions contracted directly with the tapioca starch manufacturer Ubon Sunflower Company, Ltd., for delivery of tapioca starch. Sweet Additions purchased roughly five million pounds from Ubon at a price of $73.60 per pound, about $32.80 more per pound than the price under the Meelunie Sales Contract. That meant Sweet Additions paid $1,650,100.76 more than the Sales Contract price to acquire the balance of 5,030,795 pounds of organic tapioca starch that remained on the Sales Contract when Meelunie made its last shipment to Sweet Additions.

Despite Meelunie's previous representations, it delivered to Sweet Additions four containers of product in April 2021 and made additional product available for purchase in May 2021. Meelunie informed Sweet Additions that it would release the May product when Sweet Additions paid its outstanding invoices. But Sweet Additions did not buy the May product or any other tapioca starch from Meelunie. Instead, Ubon's first deliveries arrived in May 2021.

And Sweet Additions declared a material breach by Meelunie for failing to supply organic tapioca starch in accordance with the Sales Contract. Meelunie responded by notifying Sweet Additions of past-due invoices totaling $949,767.44. Most were almost 30 days past due. But there were also invoices for interest on the past-due amounts, totaling $39,469.48. As of June 9, 2023, accrued interest at a rate of 18% per year totaled $352,108.78.

### B.  Procedural History

Sweet Additions filed suit against Meelunie for (Count 1) breach of contract and (Count 2) breach of the implied covenant of duty of good faith and fair dealing.  Meelunie responded by counterclaiming for (Count 1) common-law breach of contract, (Count 2) breach of contract under the Michigan UCC for failure to pay for delivered and received products, and (Count 3) breach of the implied covenant of good faith and fair dealing.[2]

The parties eventually cross-moved for summary judgment. The district court largely denied the motions.  *See generally Sweet Additions Ingredient Processors, LLC v. Meelunie Am., Inc.*, No. 21-81141, 2023 WL 3604106 (S.D. Fla. Mar. 21, 2023) (summary judgment order).  But it concluded that the Sales Contract incorporated Meelunie's T&Cs.  The district court reasoned that the Sales Contract references Meelunie's T&Cs twice and that Meelunie sent the T&Cs to Sweet Additions both before and after Sweet Additions signed the Sales Contract.  *See id.* at *3.

After resolving the cross-motions for summary judgment, the district court held a two-day bench trial.  At the close of Sweet Additions's case, Meelunie argued the T&Cs entitled it to judgment as a matter of law because the T&Cs' limitation of liability barred lost-profit damages and cover costs.  Although the district court did not rule at that time, it credited that argument in its post-trial Findings of Fact and Conclusions of Law.  *See generally Sweet Additions*

---

[2] At trial, however, Meelunie agreed to dismiss Count 3.

10                    Opinion of the Court                    24-10335

*Ingredient Processors, LLC v. Meelunie Am., Inc.*, No. 21-81141, 2023 WL 9508469 (S.D. Fla. Oct. 31, 2023) (FFCL).

The district court rejected Sweet Additions's breach-of-contract claim. *See id.* at *4–5.[3]  It interpreted the limitation of liability's bar on recovery of "special consequential, incidental or exemplary damages including, but not limited to, loss of profits or revenue" and "cost of substitute products" to encompass the damages Sweet Additions requested at trial. *Id.* at *3–4.  And because damage is a dispositive element in any breach claim under Michigan law, the district court concluded that it did not need to address the "other issues" relating to Sweet Additions's breach-of-contract claim. *Id.* at *5.

Then, all that remained was Meelunie's argument that Sweet Additions failed to pay for tapioca starch it delivered in 2020 and 2021, a fact the district court found "undisputed." *Id.*  So the district court ruled that Sweet Additions owed Meelunie the outstanding invoice balance of $949,767.44, the $39,469.48 in unpaid interest, the $352,108.78 in interest accrued through June 9, 2023, and the $68,144.91 in interest accrued from June 10, 2023, through the date of final judgment, October 30, 2023. *Id.* at *6.  Based on these amounts, the district court entered a $1,409,490.61 final judgment in Meelunie's favor.

---

[3] The district court also dismissed Sweet Additions's claim that Meelunie breached the covenant of good faith and fair dealing because Michigan does not recognize such a claim. *Sweet Additions*, 2023 WL 9508469, at *5.

After the district court denied Sweet Additions's motion for a new trial and to amend the final judgment, Sweet Additions timely appealed.

## II.   STANDARDS OF REVIEW

On appeal from a judgment in a bench trial, we review conclusions of law de novo. *HGI Assocs., Inc. v. Wetmore Printing Co.*, 427 F.3d 867, 873 (11th Cir. 2005). We also review de novo the district court's application of the law to the facts. *United States v. Frank*, 599 F.3d 1221, 1228 (11th Cir. 2010).

But we review the district court's factual findings for clear error. *Id.* "[C]learly erroneous" is a "highly deferential standard of review." *Holladay v. Allen*, 555 F.3d 1346, 1354 (11th Cir. 2009) (quoting *Holton v. City of Thomasville Sch. Dist.*, 425 F.3d 1325, 1350 (11th Cir. 2005)). "A finding that is plausible in light of the full record—even if another is equally or more so—must govern." *In re Wagner*, 115 F.4th 1296, 1305 (11th Cir. 2024) (cleaned up) (quoting *Cooper v. Harris*, 581 U.S. 285, 293 (2017)).

"Under Florida law, the interpretation of contracts is a question of law if the contractual language is clear and unambiguous." *Bragg v. Bill Heard Chevrolet, Inc.*, 374 F.3d 1060, 1066 (11th Cir. 2004).

## III.   DISCUSSION

On appeal, Sweet Additions advances two arguments. First, it contends the Sales Contract does not incorporate Meelunie's T&Cs. As a result, Sweet Additions urges, the limitation of liability does not apply to the parties' dispute, and no contractual language

impedes Sweet Additions's ability to recover its cover and lost-profit damages.  Second, Sweet Additions argues that, even if the Sales Contract incorporates the T&Cs, the limitation of liability bars only the recovery of special consequential, incidental, or exemplary damages, not the direct damages it seeks.

We are not persuaded by Sweet Additions's first argument. But we agree with its second.  For the reasons we explain below, the Sales Contract incorporates the T&Cs, but the limitation of liability does not completely prevent Sweet Additions from recovering damages in this lawsuit.

### A. The Sales Contract incorporates Meelunie's T&Cs.

The Florida Supreme Court has confirmed, "[i]t is a generally accepted rule of contract law that, where a writing expressly refers to and sufficiently describes another document, that other document, or so much of it as is referred to, is to be interpreted as part of the writing." *OBS Co. v. Pace Constr. Corp.*, 558 So. 2d 404, 406 (Fla. 1990).  So to "incorporate by reference a collateral document, the incorporating document must (1) specifically provide that it is subject to the incorporated collateral document and (2) the collateral document to be incorporated must be sufficiently described or referred to in the incorporating agreement so that the intent of the parties may be ascertained." *BGT Grp., Inc. v. Tradewinds Engine Servs., LLC*, 62 So. 3d 1192, 1194 (Fla. 4th DCA 2011) (cleaned up) (quoting *Kantner v. Boutin*, 624 So. 2d 779, 781 (Fla. 4th DCA 1993)).

24-10335          Opinion of the Court          13

Sweet Additions argues the Sales Contract meets neither prong of Florida's incorporation test.  We disagree.

As to the first prong, there is no reasonable dispute that the Sales Contract specifically provides that it is "subject to" the T&Cs. At the top of the agreement, it preludes the core terms by stating, "[w]e herewith confirm having SOLD to you *on our general conditions*," and, at the bottom, it explains, "[o]n all our Sales contracts, *our General Sales conditions apply*."  App'x A (emphases added).  So twice, in plain language, the contract confirms that Meelunie's general sales conditions apply.  *See Quix Snaxx, Inc. v. Sorensen*, 710 So. 2d 152, 154 (Fla. 3d DCA 1998) (explaining no "magic" words are required to incorporate a collateral document).   That goes sufficiently beyond the "mere reference to another document" with which Florida courts have taken issue.  *Harvey ex rel. Russel A. Schlegel Revocable Living Tr. v. Lifespace Communities, Inc.*, 306 So. 3d 1248, 1251 (Fla. 5th DCA 2020); *accord Calderon v. Sixt Rent a Car, LLC*, 114 F.4th 1190, 1202 (11th Cir. 2024).  We have no trouble concluding the Sales Contract specifically provides that it is subject to the incorporated collateral document.

The second question requires us to work a little harder.  It asks whether the T&Cs are "sufficiently described or referred to in the incorporating agreement so that the intent of the parties may be ascertained."  *BGT Grp.*, 62 So. 3d at 1194 (cleaned up) (quoting *Kantner*, 624 So. 2d at 781).  And the relevant case law is fact intensive. So we describe four pertinent cases—two concluding a collateral document was incorporated and two concluding it wasn't—

that help us chart a course here.  In the end, we hold the Sales Contract incorporates the T&Cs.

We start with *Spicer v. Tenet Florida Physician Services, LLC*. 149 So. 3d 163 (Fla. 4th DCA 2014).  There, the plaintiff's employment agreement contained language explaining that all disputes with Tenet were "subject to the Tenet Fair Treatment Process ["FTP"], which includes final and binding arbitration."  *Id*. at 164. The agreement also advised that the employee could contact the "Human Resources Department" with "questions" about the agreement.  *Id*.  But the agreement included no specific directions as to how the employee could locate or obtain a copy of the FTP, which, in fact, was not even a separate document.  *Id*. at 167.  Instead, it was "a subpart of the Open Door and Fair Treatment Policy, which was not mentioned or described within the employment agreement."  *Id*.  And the employee did not receive a copy of the FTP until seventeen days after signing the employment agreement. *Id*.  So with no notice and no other way for the employee to understand the terms to which she was agreeing, Florida's Fourth District Court of Appeal concluded the employment agreement did not incorporate the FTP's arbitration provision.  *Id*. at 167–68.

*BGT* followed a similar logic.  There, BGT filed a demand for arbitration against Tradewinds, arguing that an invoice for the sale of some wind turbine parts included the following line, "ALL ORDERS ARE SUBJECT TO ATTACHED BGT TERMS AND CONDITIONS."  62 So. 3d at 1194.  On the record there, the Florida court found that language insufficient to incorporate the terms

and conditions.  The problem, the court explained, was that BGT did not in fact attach the terms and conditions: "BGT failed to provide the terms and conditions during the negotiating process," and as a result, "the sales contract was formed without Tradewinds ever having seen them."  *Id.* at 1195.  Tradewinds didn't even see the terms and conditions until the contract dispute arose.  *Id.*  So the Fourth DCA concluded that BGT did not intend to incorporate the terms and conditions because it "did not provide a specific description of them or attach them to the quote and purchase order."  *Id.*

On the other side of the case law is *Kaye v. Macari Bldg. & Design, Inc.* 967 So. 2d 1112 (Fla. 4th DCA 2007).  That case involved another dispute over a putatively incorporated arbitration clause. The parties agreed that the relevant contract incorporated certain construction plans and specifications by reference, but they disagreed as to whether those plans and specifications further incorporated AIA Document No. A-201, which contained an arbitration clause.  *Id.* at 1113.  The court held that it did.  The plans and specifications said that AIA Document No. A-201 was "a part of both the plans and specifications and the contract."  *Id.* at 1114 (emphases omitted).  And the AIA Document was industry standard, so the parties knew what the concrete reference entailed—or, at least, they could easily find the document that the contract's language unambiguously incorporated.  *See id.* at 1113–14; *Spicer*, 149 So. 3d at 167 ("The citation to a specific document by date and edition in *Kaye* provided more information about the document to be incorporated than the employment agreement in this case.").  In other words, the parties knew how to easily access the referenced

16                    Opinion of the Court                24-10335

document and could readily discover the terms to which they were agreeing.

Lastly, *Avatar Properties, Inc. v. Greetham* rounds out our comparator case law. 27 So. 3d 764 (Fla. 2d DCA 2010). There, the defendants moved to arbitrate a dispute over alleged defects in a home that purportedly caused damage after a hurricane. The arbitration provision at issue was in a home-warranty contract, and the court concluded the purchase agreement expressly incorporated that home warranty. *Id.* at 766. The relevant paragraph in the purchase agreement referenced the extraneous warranty and advised the Greethams that they could review the warranty at the development's offices or could request that a copy of the warranty be attached to the purchase agreement they signed. The Greethams initialed that paragraph in the agreement, indicating they had read it and assented to the warranty's incorporation. *Id.* at 766–67. So the court concluded that "[a]ny failure on their part to avail themselves of either opportunity [to read the warranty] [was] not a basis to find that no agreement existed." *Id.* And the Second DCA compelled arbitration. *Id.* at 767.

From this case law, we can distill a guiding principle: a contract will incorporate a collateral document if the contract provides clear direction on how to access the collateral document. What is clear still depends on context, of course. Sometimes, a mere reference to a collateral document is sufficient because the collateral document is well known to the parties. *See, e.g.*, *Kaye*, 967 So. 2d at 1113–14. Or other times, a combination of the contract's

24-10335                Opinion of the Court                17

language, the parties' negotiations, and their business relationship will put the signatories on notice. *See, e.g.*, *Avatar Props.*, 27 So. 3d at 766–67; *Calderon*, 114 F.4th at 1202. *Contra BGT*, 62 So. 3d at 1194–95; *Spicer*, 149 So. 3d at 167–68.

This is one of the latter cases. Sweet Additions asserts that this case resembles *BGT*. Like *BGT*, Sweet Additions points out, the Sales Contract references general terms and conditions. And it does so with varying language—first calling them "general conditions" and later "General Sales conditions," App'x A, all while the collateral document is entitled, "TERMS AND CONDITIONS OF SALE," App'x B. In that sense, the Sales Contract departs from the contract at issue in *Kaye*, where a specific document number—identifiable to those in the industry—could easily verify the terms to be included in the contract.

But two facts distinguish this contract from the one in *BGT*.

*First*, here, a clear indication of an intent to be bound by the extraneous document exists, even if the parties did not directly include the extraneous document in their negotiations. Sweet Additions signed a single-page Sales Contract that twice explained that Meelunie was selling its product on its general terms and conditions, which were available for inspection upon request. The brevity of the Sales Contract, and the clarity of its direction on how to obtain the T&Cs, is analogous to the purchase agreement in *Avatar Properties*, where the Greethams initialed the paragraph that incorporated the home warranty and that provided directions on how to review the home warranty.

Sweet Additions is also not in the same position as the employee in *Spicer*, where the contract stated only that the employee could contact the "Human Resources Department" with "questions" about the FTP, which was not even an independent, collateral document. *See Spicer*, 149 So. 3d at 164; *see also Calderon*, 114 F.4th at 1202–03. Rather, just like how the purchase agreement informed the Greethams in a single paragraph they initialed that they could have viewed the home warranty at the development's offices, the Sales Contract informed Sweet Additions on the sparsely populated single page it signed that it could have reviewed the T&Cs upon a request to Meelunie.

And *second*, Sweet Additions had the T&Cs in hand before signing the Sales Contract. *Contra BGT*, 62 So. 3d at 1194–95; *Spicer*, 149 So. 3d at 167–68. Meelunie sent Sweet Additions the T&Cs when it forwarded invoices pertaining to the line of credit that Meelunie extended Sweet Additions. And Sweet Additions paid those invoices under the T&Cs. True, as Sweet Additions points out, Meelunie did not attach the T&Cs to any negotiations about the Sales Contract. *See Spicer*, 149 So. 3d at 167 (identifying as an "important fact" precluding incorporation by reference that Tenet "failed to provide the terms and conditions during the negotiating process"). But Florida law does not adopt such a strict approach to incorporation by reference. A course of dealing[4]—that is, the

---

[4] A course of dealing is not to be confused with a course of performance, which refers to the "sequence of conduct between the parties [with respect] to a particular transaction." FLA. STAT. § 671.205(1).

"sequence of conduct concerning previous transactions between the parties to a particular transaction"—may establish "a common basis of understanding for interpreting [the parties'] expressions and other conduct." FLA. STAT. § 671.205(2) (codifying UCC § 2-202(b)). And unless specially negated, courses of dealing inform the meaning of the words used in a contract. *See id.*; *L & H Constr. Co. v. Circle Redmont, Inc.*, 55 So. 3d 630, 634 (Fla. 5th DCA 2011) (per curiam); *cf. Rhodes v. BLP Assocs., Inc.*, 944 So. 2d 527, 531 (Fla. 4th DCA 2006) (explaining a prior course of dealing cannot thwart "clear, unambiguous language"). So here, the parties' adherence to the T&Cs throughout their relationship shows Meelunie understood what the terms "general conditions" and "General Sales conditions" referred to, App'x A—the "TERMS AND CONDITIONS OF SALE," App'x B.

Ultimately, we enforce the "intent of the parties at the time of contracting," as embodied in the written instrument. *OBS Co.*, 558 So. 2d at 406. The Sales Contract expressly applies the T&Cs. And a Sweet Additions officer signed the one-page agreement. Sweet Additions had seen the incorporated T&Cs before it signed the Sales Contract, and it assented to the T&Cs in performing previous purchase orders. So we conclude the Sales Contract incorporates the T&Cs.

### B. The limitation of liability does not preclude Sweet Additions from recovering lost profits and the cost of substitute products if they are direct damages.

Because we conclude the Sales Contract incorporates the T&Cs, we must consider Sweet Additions's second contention that the limitation of liability does not limit its ability to recover its damages, particularly lost profits and the cost of substitute products.

The T&Cs' limitation provides that Meelunie's "liability on any claim for loss or damage . . . shall not exceed the price allowable to such goods" on the contract "or part thereof involved in the claim." App'x B § 5. This clause reasonably limits Meelunie's direct liability. But in addition, the limitation disclaims all liability for "special consequential, incidental or exemplary damages including, but not limited to, loss of profits or revenue . . . [and the] cost of substitute products." *Id.*

Meelunie and the district court read these provisions to bar Sweet Additions from recovering lost profits and damages it incurred in obtaining substitute products—or, in UCC speak, effecting "cover." But Sweet Additions disagrees. It argues that lost profits and cover costs are *not* necessarily consequential, incidental or exemplary damages. Rather, Sweet Additions asserts, they can be direct damages under the UCC, so the limitation of liability bars their recovery only to the extent that those damages are consequential, incidental, or exemplary.

24-10335                Opinion of the Court                21

For four reasons, we agree with Sweet Additions's interpretation of the T&Cs.[5]

*First*, the limitation of liability's structure supports Sweet Additions's position. The provision creates a dichotomy between general "liability on any claim for loss or damage" and specific liability for "special consequential, incidental or exemplary damages." And that dichotomy tracks the usual distinction between direct and incidental or consequential damages. Direct damages flow immediately from the seller's breach. By contrast, "consequential damages do not arise within the scope of the immediate buyer-seller transaction, but rather stem from losses incurred by the non-breaching party in its dealings, often with third parties, which were a proximate result of the breach, and which were reasonably foreseeable by the breaching party at the time of contracting." *Sullivan Indus., Inc. v. Double Seal Glass Co.*, 480 N.W.2d 623, 631 (Mich. Ct. App. 1991) (quoting *Petroleo Brasileiro, SA v. Ameropan Oil Corp.*, 372 F. Supp. 503, 508 (E.D.N.Y. 1974)).

Under the UCC and Michigan law, cover costs are typically direct damages. "Section 2-712 of the Code permits [a plaintiff] to 'cover' in any commercially reasonable manner in the market place to secure alternative goods or services necessitated by the breach of the contract." *Mead Corp. v. McNally-Pittsburg Mfg. Corp.*, 654 F.2d 1197, 1207 n.14 (6th Cir. 1981). And a buyer may recover "the difference between the cost of cover and the contract price *together*

---

[5] We interpret the T&Cs under Michigan law because Section 10 of the T&Cs directs us to do so. *See* App'x B § 10.

*with* any incidental or consequential damages."  MICH. COMP. LAWS § 440.2712 (emphasis added); *see Lorenz Supply Co. v. Am. Standard, Inc.*, 300 N.W.2d 335, 339 (Mich. Ct. App. 1980), *aff'd*, 358 N.W.2d 845 (Mich. 1984).  So the UCC's definition of cover costs separately identifies direct damages from consequential damages that may result from a breach of a contract for a sale of goods.

And the UCC goes further than just identifying that distinction between direct and incidental or consequential damages.  Not only does the UCC separately define incidental and consequential damages, *see, e.g.*, MICH. COMP. LAWS § 440.2715 (defining consequential and incidental damages that buyers may recover), it also separately defines forms of incidental and consequential damages *with respect to cover*.  The UCC defines "[i]ncidental damages" to include (among other things) "expenses or commissions in connection with effecting cover," and it defines "consequential damages" as losses "resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover."  *Id.* In other words, the UCC, as adopted by Michigan law, enables buyers to recover both direct damages associated with obtaining substitute products and other indirect and consequential damages foreseeably associated with effecting cover.

The dichotomy holds for lost profits, too.  Indeed, "courts regularly conclude that in the business service context, some lost revenues or lost profits are well within the ambit of direct damages."  *Reid Hosp. & Health Care Servs., Inc. v. Conifer Revenue Cycle*

*Sols., LLC*, 8 F.4th 642, 649 (7th Cir. 2021) (interpreting a similar limitation of liability provision); *see, e.g.*, *Energy Cap. Corp. v. United States*, 302 F.3d 1314, 1328–29 (Fed. Cir. 2002) (affirming an award of lost-profit damages and rejecting an argument that profits on anticipated loans were "consequential" because the profits would have accrued "as the direct and immediate results" of fulfilling the contract (quoting *Wells Fargo Bank N.A. v. United States*, 88 F.3d 1012, 1021, 1023 (Fed. Cir. 1996))). Perhaps in this context, Sweet Additions's lost profits are consequential damages because they are not within "the scope of the immediate buyer-seller transaction, but rather stem from losses incurred by the nonbreaching party in its dealings." *Sullivan Indus.*, 480 N.W.2d at 631 (quoting *Petroleo Brasileiro*, 372 F. Supp. at 508). But perhaps not. That's an issue that the parties did not litigate before us and that we're not positioned to resolve.

What we can confirm, though, is that it would not make sense to interpret the T&Cs to collapse a clear statutory and practical distinction in the roundabout way Meelunie suggests that the T&Cs do—by implicitly redefining what may be direct damages as always consequential, indirect, or special damages. Rather, the most reasonable interpretation of the limitation of liability is that a plaintiff may not recover lost profits and the costs of substitute goods *to the extent that they are special consequential, incidental or exemplary damages*.

*Second*, canons of interpretation confirm what we glean from the limitation of liability's structure and Michigan's statutes.

We must interpret "a word or phrase . . . by its context or setting." *Bloomfield Ests. Improvement Ass'n, Inc. v. City of Birmingham*, 737 N.W.2d 670, 675 (Mich. 2007) (quoting *Koontz v. Ameritech Servs., Inc.*, 645 N.W.2d 34, 42 (Mich. 2002)) (applying the doctrine of *noscitur a sociis*). And here, the contextual clues suggest the limitation of liability does not bar recovery of all cover costs.

For one thing, the provision lists "loss of profits" and "costs of substitute goods" in a nonrestrictive subordinate clause that, according to the laws of grammar, typically gives only "supplemental, nondefining information." BRYAN A. GARNER, GARNER'S DICTIONARY OF LEGAL USAGE 888 (3d ed. 2011). We know that to be the case because we can omit "including . . ." from the limitation of liability "without changing the essential meaning" of the provision and without undoing the "grammatical and logical completeness of a sentence." *Id.* (differentiating restrictive and nonrestrictive clauses).

And "loss of profits" and "costs of substitute goods" follow the word "including," which means "to place, list, or rate as a part or component of a whole or of a larger group, class, or aggregate." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1143 (Philip Babcock Gove ed., 1993) [hereinafter WEBSTER'S] (defining "include"). Based on that definition, "[t]he more general term informs the subsequently listed examples, not the other way around, and so" "loss of profits" or "costs of substitute goods" "here refer only to those that are 'a part or component' of the larger group or class of" consequential, incidental, or exemplary damages. *Penncro*

*Assocs., Inc. v. Sprint Spectrum, L.P.*, 499 F.3d 1151, 1156 (10th Cir. 2007) (Gorsuch, J.) (quoting WEBSTER'S, *supra*, at 1143). In turn, the plain meaning of "consequential, incidental or exemplary damages" controls our interpretation of the limitation of liability.

Plus, practically every other example in the nonrestrictive subordinate clause—loss of use of the product or any associated product, cost of capital, facilities, or service, downtime costs, and claims of the buyer's customers for damages—is a prototypical incidental or consequential damage that adds little to the clause it supplements. And we ought to treat "loss of profits" and "cost of substitute products" just as we would any other term in that list: as an example, not a definition. *See Powers v. Bone*, No. 367748, 2025 WL 466349, at *4 (Mich. Ct. App. Feb. 11, 2025) (per curiam) (explaining "the principle of *noscitur a sociis* asserts that the meaning of an unclear word or phrase, especially one in a list, should be determined by the words immediately surrounding it" (internal quotation marks omitted)). So both grammatical and interpretational canons warrant permitting Sweet Additions to recover lost profits and the costs of substitute products if they are direct damages.

*Third*, Meelunie's interpretation of the limitation of liability would undermine the purpose of a fixed-price contract for a sale of goods and threaten the potential consideration necessary for the existence of the Sales Contract in the first place. The purpose of a fixed-price contract is to protect the buyer from increases in the market price and the seller from decreases in the market price. *See Kyocera Corp. v. Hemlock Semiconductor, LLC*, 886 N.W.2d 445, 453

(Mich. Ct. App. 2015).  If a seller breaches, the only way for the buyer to obtain the benefit of its bargain on the original fixed-price contract is to mitigate damages by finding an alternative supplier and to sue the original seller for the difference in the contract price. To adopt Meelunie's reading of the limitation of liability would foreclose the primary, if not the only, avenue for a nonbreaching buyer to fully benefit from its bargain.

But Michigan law directs us to "liberally administer[]" the UCC's remedies so that "the aggrieved party may be put in as good a position as if the other party had fully performed."  MICH. COMP. LAWS § 440.1305(1).  As a result, courts must sometimes reject interpretations of contractual provisions that would award windfalls to a wrongfully breaching party.  *See, e.g.*, *Kyocera Corp.*, 886 N.W.2d at 453 (refusing to interpret a force-majeure clause to "relieve plaintiff from the very risk it contracted to assume"); *Latimer v. William Mueller & Son, Inc.*, 386 N.W.2d 618, 625 (Mich. Ct. App. 1986) (refusing to apply a limitation of liability because "the remedy prescribed in" it was "an illusory one which represents no remedy at all"); *see also Citizens Ins. Co. of Am. v. Proctor & Schwartz, Inc.*, 802 F. Supp. 133, 143 (W.D. Mich. 1992) ("[W]here the remedy prescribed in a limitation of liability clause is necessarily illusory, failing of its essential purpose, the clause may be held unconscionable."), *aff'd*, 15 F.3d 558 (6th Cir. 1994).

True, "parties are generally free to agree to whatever they like [in a contract], and, in most circumstances, it is beyond the authority of the courts to interfere with the parties' agreement."

*Wilkie v. Auto-Owners Ins. Co.,* 664 N.W.2d 776, 787–88 (Mich. 2003) (footnote omitted). But that principle means only that we should enforce a contract's unambiguous language. It does not require us to adopt inequitable readings of a contract when, as we've already discussed, the plain language does not require it, much less suggest it. Plus, Meelunie, the contract's drafter, could have written a far clearer provision. *See Lichnovsky v. Ziebart Int'l Corp.,* 324 N.W.2d 732, 738 (Mich. 1982) (construing a contract against the drafter); *Penncro Assocs.,* 499 F.3d at 1157–58 (explaining Sprint could have "easily . . . preclude[d] lost profits" by "singl[ing]" them "out as a separate and distinct category of forbidden damages" rather than "plac[ing]" them "in an illustrative list of the sorts of consequential damages excluded").

Adopting Meelunie's urged construction may also nullify the existence of any contract by rendering it illusory. *See M&G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 440 (2015) (explaining the "illusory promises doctrine . . . instructs courts to avoid constructions of contracts that would render promises illusory because such promises cannot serve as consideration for a contract"). "An illusory contract is defined as an agreement in which one party gives as consideration a promise that is so insubstantial as to impose no obligation," rendering "the agreement unenforceable." *Emps. Mut. Cas Co. v Helicon Assocs., Inc.*, 880 N.W.2d 839, 843 (Mich. Ct. App. 2015) (cleaned up) (quoting *Ile v. Foremost Ins. Co.*, 809 N.W.2d 617, 622 (Mich. Ct. App. 2011), *rev'd on other grounds sub nom. Ile ex rel. Ile v. Foremost Ins. Co.*, 823 N.W.2d 426 (Mich. 2012)), *rev'd on other grounds*, 894 N.W.2d 545 (Mich. 2017). In context, that

means a contract is illusory if the seller has the sole discretion to walk away from the sale. *See Tobel v. AXA Equitable Life Ins. Co.*, No. 298129, 2012 WL 555801, at *4 (Mich. Ct. App. Feb. 21, 2012) (per curiam) (explaining "a contract that is cancellable at will by one party can create an illusory obligation" (citing *Lichnovsky*, 324 N.W.2d at 740 n.25)). And Meelunie's interpretation of the T&Cs would enable it to deny any sale at its discretion.

Under the UCC, nonbreaching buyers may cancel a contract (§ 2-711), "cover" by purchasing substitute goods in the market without unreasonable delay (§ 2-712), recover damages for non-delivery or repudiation (§ 2-713), recover damages for breach of contract because of defective or non-conforming goods (§ 2-714), recover incidental and consequential damages (§ 2-715), request specific performance or replevin if unique goods are involved (§ 2-716), or deduct damages from any balance still outstanding (§ 2-717). *See Mead Corp.*, 654 F.2d at 1207 n.14.

If we excluded lost profits and cover costs from this list of remedies, no monetary remedies would remain. Plaintiffs do not recover damages when they cancel a contract. Not only that, but one is entitled to both cancel a contract *and* recover monetary damages in response to a material breach. *See Blazer Foods, Inc. v Restaurant Props., Inc.*, 673 N.W.2d 805, 812 n.7 (Mich. Ct. App. 2003). Section 2-714 also would not apply because there are no nonconforming goods that may form the basis of Sweet Additions's damages calculation. Nor could Sweet Additions request specific performance: tapioca starch is a non-unique good. And to the extent that

24-10335                    Opinion of the Court                    29

Sweet Additions could deduct damages from its outstanding balance, that damages calculation would just be the cost of cover or lost profits; Section 2-717 isn't an independent monetary remedy. In short, Meelunie could walk away from the Sales Contract under its reading, and there would not be a viable benefit-of-the-bargain remedy for Sweet Additions to pursue. In fact, it is unclear that Sweet Additions could press any monetary remedy.

Even so, Meelunie suggests that its contract is not illusory because "[h]ad Meelunie refused to deliver Product just because it did not want to," Sweet Additions could "enforce the Contract or breach of Contract" and recover damages that "would 'not exceed the price allowable to such goods or part thereof involved in the claim.'"[6]  Appellee's Br. at 54–55 (quoting App'x B § 5). That

---

[6] Meelunie also argues that it shipped tapioca starch in May and that Sweet Additions improperly elected to buy product from a different source. But Meelunie confuses illusoriness with its willingness to perform the contract. The former is a question of law, and the latter is a question of breach and repudiation, a factual one the district court did not yet address. True, sometimes, performance may cure a defect in an original promise and create a binding contract. *Bastian v. J.H. Du Prey Co.*, 245 N.W. 581, 581 (Mich. 1932). But this is not the case in which a party performed "even though he or she could not originally have been compelled to do so" and where, after performing, the party sought to enforce the contract. *Petersen v. W. Mich. Cmty. Mental Health*, No. 10-cv-12, 2010 WL 3210749, at *2 (W.D. Mich. Aug. 10, 2010) (quoting 17A Am. Jur. 2d *Contracts* § 25 (2010)), *aff'd*, 468 F. App'x 608 (6th Cir. 2012). Rather, Meelunie allegedly performed *after* Sweet Additions declared that Meelunie materially breached and now asserts *after* it allegedly performed that it never needed to do so in the first place. So if the district court finds for Sweet Additions, Meelunie is the non-performing party seeking to abuse a contract's

response, though, seems to be a non-answer, or, at a minimum, a concession from Meelunie that its legal position is incorrect. If Meelunie contends that, upon a breach, Sweet Additions could recover damages consistent with the T&Cs' generic damages limitation, we fail to see how Meelunie interprets the limitation of liablity any differently than Sweet Additions does. Had Meelunie declined to perform simply because it did not want to, and Sweet Additions tried to mitigate the damage Meelunie caused by effecting cover, under Meelunie's theory of non-illusoriness, Sweet Additions should be able to recover damages so long as they do not "exceed the price allowable" to the goods Meelunie originally promised to ship. *See* App'x B § 5. Perhaps Meelunie is not objecting to the idea that Sweet Additions may recover the benefit of its bargain, and it contests only the specific calculation of the benefit of the bargain: lost profits and cover costs. But even then, we're left with a non-answer, for Sweet Additions would still have no other way to calculate its damages.

We also respectfully disagree with the district court's theory as to why the contract isn't illusory. The district court explained that Sweet Additions could recover any amounts paid and cancel the rest of the contract. But those remedies do not save a contract from illusoriness. The equitable remedy of rescission differs from

---

purported illusoriness, not the performing party seeking to secure the benefit of the bargain. *Cf. Tobel*, 2012 WL 555801, at *6 (enforcing a contract's potentially illusory terms where "all parties performed under the terms of the Cash Account Agreements" and the plaintiffs attempted to "now avoid the terms of those agreements").

some measure of expectation, or even reliance, damages.  To cancel a contract and receive monies already paid is just an attempt to place the nonbreaching party in the position it would occupy had the contract never been performed.  *See Bazzi v. Sentinel Ins. Co.*, 919 N.W.2d 20, 29 (Mich. 2018) ("Rescission abrogates a contract and restores the parties to the relative positions that they would have occupied if the contract had never been made.").  That remedy is inherently backward looking and merely prevents a party from committing fraud by retaining payment after refusing to perform. Rescission does not "impose" an "obligation" on Meelunie to fulfill its promises.  *Emps. Mut.*, 880 N.W.2d at 843 (quoting *Ile*, 809 N.W.2d at 622).  And that means the contract would be illusory.

So both the UCC's preference for a liberal administration of remedies and Michigan's treatment of illusory contracts counsels against Meelunie's interpretation of the limitation of liability.

*Fourth*, and finally, our sister circuits, as well as other courts throughout the country, have interpreted similar limitations of liability as we now do—barring recovery of listed examples of damages, typically lost profits, when they are indirect or consequential but permitting recovery when they are direct.  *See, e.g.*, *Penncro Assocs.*, 499 F.3d at 1157; *Conifer Revenue*, 8 F.4th at 650–51, 654; *see also Coremetrics, Inc. v. Atomic Park.com, LLC*, No. C-04-0222, 2005 WL 3310093, at *4 (N.D. Cal. Dec. 7, 2005); *Ingraham v. Planet Beach Franchising Corp.*, No. 07-3555, 2009 WL 1076713, at *1–2 (E.D. La. Apr. 17, 2009); *Claredi Corp. v. SeeBeyond Tech. Corp.*, No. 04CV1304, 2010 WL 1257946, at *5–6 (E.D. Mo. Mar. 26, 2010); *Cont'l AFA*

*Dispensing Co. v. AFA Polytek, B.V. (In re Indesco Int'l, Inc.)*, 451 B.R. 274, 315–16 (Bankr. S.D.N.Y. 2011); *Optimal Interiors, LLC v. HON Co.*, 774 F. Supp. 2d 993, 1010–11 (S.D. Iowa 2011); *EMS, Inc. v. Chegg, Inc.*, No. 11CV113, 2012 WL 5412956, at *5 (D. Neb. Nov. 6, 2012); *Nielsen Co. (US) v. Success Sys., Inc.*, 112 F. Supp. 3d 83, 103 (S.D.N.Y. 2015); *Martin v. Bimbo Foods Bakeries Distrib., Inc.*, No. 14-CV-17-BR, 2016 WL 5173249, at *2 (E.D.N.C. Sept. 21, 2016); *City of Waco v. Kleinfelder Cent., Inc.*, No. 15-CV-310, 2016 WL 5854290, at *6–7 (W.D. Tex. Oct. 6, 2016); *Moses H. Cone Mem'l Hosp. Operating Corp. v. Conifer Physician Servs., Inc.*, No. 13CV651, 2017 WL 1378144, at *7–9 (M.D.N.C. Apr. 11, 2017).

This robust body of precedent confirms we're properly applying first principles to the contract in dispute. But these cases also inform the meaning of the limitation of liability itself. Michigan courts "have consistently construed unambiguous language in one contract in the same way it was construed in an earlier case involving identical language." *County of Bay v. Blue Cross Blue Shield*, No. 307447, 2013 WL 6670894, at *3 (Mich. Ct. App. Dec. 17, 2013) (per curiam); *see, e.g.*, *Heniser v. Frankenmuth Mut. Ins.*, 534 N.W.2d 502, 508 (Mich. 1995) (agreeing with how the Georgia Court of Appeals interpreted an identical contract provision about an insured residing at property at the time of loss); *Wells Fargo Bank, NA v. Cherryland Mall Ltd. P'ship*, 812 N.W.2d 799, 815–16 (Mich. Ct. App. 2011) (per curiam) (adopting a reading of certain "standardized nationwide" terms consistent with those of other courts); *Tenneco Inc. v. Amerisure Mut. Ins. Co.*, 761 N.W.2d 846, 869 (Mich. Ct. App. 2008) (per curiam) (adopting an interpretation consistent with those of

other courts because they "applied principles of construction Michigan courts would employ when interpreting identical language in a general liability policy in a strikingly similar factual setting").

That practice makes sense because courts interpret contracts "in accordance with their commonly used meanings." *Morinelli v. Provident Life & Accident Ins. Co.*, 617 N.W.2d 777, 781 (Mich. Ct. App. 2000). If a provision is common, and courts commonly apply it in the same way, then, when parties use that provision in a contract, we can readily presume the parties intended to adopt its usual judicial interpretation. And here, Sweet Additions's appraisal of the contract fits the common reading of similar limitations of liability.

In sum, the limitation of liability's structure, traditional cannons of interpretation, the purpose of a fixed-price contract, and the limitation of liability's common judicial interpretation compel the conclusion that Sweet Additions may recover lost profits and the costs of substitute products to the extent that those damages are direct and otherwise satisfy the provision's total cap on recoverable damages.

## IV. CONCLUSION

For the reasons we've just explained, we vacate the judgment of the district court and remand for further proceedings consistent with this opinion.

**VACATED AND REMANDED.**

34                    Opinion of the Court                    24-10335

**APPENDIX A**

Southfield, 9/16/2019

## SALES CONTRACT SMA015193

We herewith confirm having SOLD to you on our general conditions

**PRODUCT**     : Organic Tapioca starch, food grade, Windmill brand

**QUANTITY**    : 19,841,400 LB loaded in 360 FCL/40ft container(s) of 55,115 LB

**PACKING**     : 40x25kg bags, Windmill brand net, Pallets

**PRICE**       : USD 40.80 Per 100 LB , including packing

**DELIVERY**    : DDP MINNEAPOLIS MN US - DIRECT, (Incoterms 2010)

**SHIPMENT**    : January 2020 - December 2020

**PAYMENT**     : Check, 45 days net from date of Invoice

**REMARKS**     : Seller will cover Customs and Clearance prior to arrival.- The customer is
                  responsible for the accessorial costs if the containers are not returned within
                  the alotted time period. Number of free days are to be determined and
                  Sweet Additions will be notified prior to arrival.

Yours sincerely,

MEELUNIE AMERICA INC.

_____     Todd Watts          David Abbeg
Sweet Additions Ingredient Processor  Todd Watts          David Abbeg
                                      by Erik Ratliff      by Erik Ratliff

Please send all Purchase Orders to orders@meelunie.com.

**Global Supplier Of Agricultural Ingredients**

On all our Sales contracts, our General Sales conditions apply. A copy of these conditions can be obtained upon request.

**APPENDIX B**

### TERMS AND CONDITIONS OF SALE

All sales of any goods by Meelunie America, Inc. are expressly conditioned upon the terms and conditions set forth below. Any order or any statement of intent to purchase any such goods or any direction to proceed shall constitute assent to said terms and conditions. Any additional or different terms or conditions set forth in Buyer's purchase order or similar communication are objected to and will not be binding upon Meelunie America unless specifically assented to in writing by an authorized representative of Meelunie America. Any deviation after placement of order such as changes in quantity or partial release will be subject Meelunie America's terms and conditions where applicable.

1. **PRICES AND TERMS.** All prices by Meelunie America are subject to change without notice. Prices do not include any present or future sales, uses, excise, value-added or similar taxes and, where applicable, such taxes shall be billed as a separate item and paid by the Buyer (Any and all changes is excise tax, duties, or other taxes are to buyers account). All sales are made F.O.B. point of shipment. Buyer is also deemed to have accepted the Meelunie America's order confirmation if the supplier has executed any part of the buyers requested order. Meelunie America's order may contain an abbreviated "incoterm" condition (such as FOB or CIF etc.), such "incoterms" are to be interpreted according to the most recent definitions published by I.C.C.

2. **DELIVERY.** Shipping dates given in advance of actual shipment are estimates and shall not be deemed to represent fixed or guaranteed shipping dates. Meelunie America shall not be liable for failure to deliver or for delay in delivery or performance due to (i) a cause beyond its reasonable control or (ii) an act of God, act or omission of Buyer, act of civil or military authority, governmental priority or other allocation or control, fire, strike or other labor difficulty, riot or other civil disturbance, insolvency or other inability to perform by the manufacturer, delay in transportation, or (iii) any other commercial impracticability. In the event of any such delay, Meelunie has the option to either cancel the order(s) or delay the date of delivery. In addition to any other right which Meelunie America may have hereunder or at law, Meelunie America may suspend or cancel shipment of any goods for which Meelunie America has not already received whenever Buyer is in default under this or any other contract of sale between Meelunie America and Buyer. Additionally, all contracts must be taken in approximate equal volumes throughout the contract period. Customer agrees that any deviation in draws of contract volumes other than equal monthly draws are completely at the discretion on Meelunie.

3. **PAYMENTS AND FINANCIAL CONDITION.** Each shipment or delivery shall be deemed to have been sold under a separate and independent contract. Any order for goods by Buyer shall constitute a representation that Buyer is solvent. If, in the judgment of Meelunie America, the financial condition of the Buyer at the time of shipment does not justify the terms of payment specified, Meelunie America reserves the right to require from Buyer full or partial payment or other adequate assurance of performance before manufacture or shipment. Meelunie America reserves the right to suspend its performance until such payment or adequate assurance of performance has been received. If payment is not made when due, Buyer agrees to pay a charge on the amount past due at the rate of 1-1/2% per month (18% per annum) or the maximum lawful rate, whichever is less. Nothing herein shall be deemed to extend or otherwise modify Buyer's obligations to make payment when due. In the event of default, Buyer agrees to pay Meelunie America reasonable attorney fees, if any, incurred by Meelunie America in collection of damages from Buyer.

4. **WARRANTIES.** Goods sold by Meelunie America are the products of a reputable manufacturer and are in accordance with the manufacturer's warranty (copies of which will be furnished upon request) or customary practice, the repair or replacement of goods that may prove defective in material or workmanship. The foregoing shall constitute the exclusive remedy of the Buyer and the sole obligation of Meelunie America. Except as to title, THERE ARE NO WARRANTIES, EITHER WRITTEN, ORAL, IMPLIED OR STATUTORY, relating to the described goods, which extend beyond that described in this paragraph. NO IMPLIED STATUTORY WARRANTY OF MERCHANTABILITY OR FITNESS FOR PARTICULAR PURPOSE SHALL APPLY.

5. **LIMITATION OF LIABILITY.** Meelunie America's liability on any claim for loss or damage arising out of this contract or from the performance or breach thereof or connected with the supplying of any goods hereunder, or their sale, resale, operation or use, whether based on contract, warranty, tort (including negligence) or other grounds, shall not exceed the price allowable to such goods or part thereof involved in the claim. Meelunie America shall not, under any circumstances, be liable for any labor charges without the prior written consent of Meelunie America. Meelunie America shall not in any event be liable, whether as a result of breach of contract, warranty, tort (including negligence) or other grounds, for special consequential, incidental or exemplary damages including, but not limited to, loss of profits or revenue, loss of use of the product or any associated product, cost of capital, cost of substitute products, facilities or service, downtime costs, or claims of customers of the Buyer for such damages. If Meelunie America furnishes Buyer with advice or other assistance which concerns any good supplied hereunder, and which is not required pursuant to this contract, the furnishing of such advice or assistance will not be subject Meelunie America to any liability, whether based on contract, warranty, tort (including negligence) or other grounds.

6. **TERMINATION.** Buyer may terminate an order only by mutual agreement based upon payment to Meelunie America of reasonable and proper termination charges.

7. **RETURNED GOODS.** Goods may not be returned without the specific written consent of Meelunie America.

8. **ASSIGNMENT.** The delegation or assignment by Buyer of any or all of its duties or rights hereunder without the prior written consent of Meelunie America shall be void.

9. **ARBITRATION.** Any dispute or claim arising out of, or relating to this agreement or breach or performance thereof, shall be settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association currently in effect, unless the parties mutually agree otherwise. The decision and award of the arbitrators shall be final and binding upon both parties, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof. Such arbitration shall take place in Southfield, Michigan.

10. **INTEPRETATION OF CONTRACT.** This contract shall be construed according to the laws of, and under the Uniform Commercial Code as adopted by, the State of Michigan. Except where otherwise expressly stated in this agreement, all terms and conditions herein shall have the same definitions as set forth in the Uniform Commercial Code as adopted and in effect in the State of Michigan.

This agreement contains all the terms, conditions and obligations to which the parties have agreed, and shall not be modified, controlled or affected in any way by usage of trade not expressly included in this agreement and may be modified only by a writing signed by both parties.